UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------x
NINA BEKTIC-MARRERO, as Administratrix of the Estate of
JOSE R. MARRERO, on her own behalf, and as Parent and
Natural Guardian of her infant child, S.M.,                                    **COMPLAINT**

                                                    Plaintiffs,

                              v.

RANDY GOLDBERG, M.D., WESTCHESTER COUNTY,
WESTCHESTER COUNTY HEALTH CARE CORPORATION,            **JURY TRIAL**
WESTCHESTER MEDICAL CENTER, NEW YORK MEDICAL           **DEMANDED**
COLLEGE, ANDREW SPANO, JOSEPH SPANO, ANTHONY
AMICUCCI, GAIL BAILEY-WALLACE, M.D., and
JUNE YOZZO, R.N.,

                                                    Defendants.
-----------------------------------------------------------------------------------x


      Plaintiff NINA BEKTIC-MARRERO, as Administratrix of the Estate of JOSE R.

MARRERO, on her own behalf, and as Parent and Natural Guardian of her infant child, S.M., by

and through her attorney Michael A. Deem, Esq., states as follows:


## PRELIMINARY STATEMENT

      1.     This is a combined civil rights, personal injury and wrongful death action in

which plaintiffs seek redress for the violation of their rights. The claims arise from a practice of

depriving inmates of the Westchester County Jail their constitutional right to adequate medical

attention, as determined by the U.S. Department of Justice during to an investigation pursuant to

the Civil Rights of Institutionalized Persons Act ("CRIPA"). Specifically, the defendants were

deliberately indifferent to Mr. Marrero's serious medical needs – his increasing and eventual

inability to swallow any food or water, failure to diagnose or treat severe and rapid weight loss,

failure to diagnose timely chronic signs of esophageal cancer, and refusal to treat timely or

adequately known esophageal cancer. In short, Mr. Marrero was allowed to suffer virtual starvation due to a cancerous tumor in his throat. That tumor was not treated until after it had progressed to Stage IV.

2.      Plaintiffs seek compensatory, punitive, and presumed damages against defendants, an award of attorneys' fees, costs and disbursements, and such other and further relief as the Court deems just and proper.


## JURISDICTION

3.      This action is brought pursuant to 28 U.S.C. §§1331 and 1343, 42 U.S.C. §1983, and the Eighth and Fourteenth Amendments to the U.S. Constitution.

4.      Supplemental jurisdiction pursuant to 28 U.S.C. §1367 exists for claims of medical negligence, gross negligence, negligence, loss of consortium, and wrongful death.

5.      Venue is laid within the U.S. District Court for the Southern District of New York in that a substantial part of the events or omissions giving rise to the claims occurred within this judicial district, and plaintiffs are residents of Bronx County, New York.


## PARTIES

6.      Decedent JOSE R. MARRERO ("Mr. Marrero") was a citizen of the United States and resided in Dutchess County at the time of his death on September 23, 2010. At the time of his passing Mr. Marrero was fifty-one years old, and married to NINA BEKTIC-MARRERO. On February 15, 2011, Letters of Limited Administration were issued to Mrs. Bektic-Marrero, granting her authority to file and prosecute claims of Mr. Marrero's estate.

7.      Plaintiff NINA BEKTIC-MARRERO ("Mrs. Bektic-Marrero") is a domiciliary of the State of New York and currently resides in Bronx County. She is the widow of Mr. Marrero and legally blind. Mrs. Bektic-Marrero asserts claims in this action in three capacities, as Administratrix of the estate of JOSE MARRERO, in her individual capacity, and as the parent and natural guardian of her infant child S.M.

8.      Plaintiff S.M. is a citizen of the United States and currently resides with his mother in Bronx County. S.M. is three years old, the sole child of the marriage, and heir of Mr. Marrero.

9.      Defendant WESTCHESTER COUNTY, was at all times relevant herein, a municipal corporate subdivision of the State of New York, responsible for the policies, practices, and customs of the Westchester County Department of Correction.

10.     Defendant WESTCHESTER COUNTY HEALTH CARE CORPORATION ("WCHCC"), was at all times relevant herein, a public benefit corporation duly existing by reason of and pursuant to the laws of the State of New York.

11.     Defendant WESTCHESTER MEDICAL CENTER ("WMC"), was at all times relevant herein, a medical services corporation duly existing by reason of and pursuant to the laws of the State of New York.

12.     Defendant NEW YORK MEDICAL COLLEGE ("NYMC"), was at all times relevant herein, a private medical school in Valhalla, New York, organized as a domestic not-for-profit corporation duly existing by reason of and pursuant to the laws of the State of New York, that entered into a written contract to provide, and was a joint participant in the provision of, medical care, treatment and/or services to inmates in the WDOC. It is sued as both a private and state actor.

3

13.     Defendant ANDREW SPANO , was at all times relevant herein, the duly elected and acting Westchester County Executive, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and practice of Westchester County and the State of New York. He is sued in his individual capacity.

14.     Defendant JOSEPH SPANO, was at all times relevant herein, the duly appointed and acting Commissioner of the Westchester County Department of Correction ("WDOC"), acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and practice of Westchester County and the State of New York. He is sued in his individual capacity.

15.     Defendant ANTHONY AMICUCCI, was at all times relevant herein, the duly appointed and acting Warden of the WDOC, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and practice of Westchester County and the State of New York. He is sued in his individual capacity.

16.     Defendant GAIL BAILEY-WALLACE, M.D., was at all times relevant herein, the duly appointed and acting Medical Director for Chronic Care Services at Correctional Health Services, a division of the New York Medical College Department of Medicine, at the WDOC, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and practice of Westchester County, WCHCC, and/or the State of New York. She is sued in her individual capacity.

17.     Defendant RANDY GOLDBERG, M.D., was at all times relevant herein, the duly appointed and acting Assistant Medical Director for Chronic Care Services at Correctional Health Services, a division of the New York Medical College Department of Medicine, at the WDOC, acting under color of law pursuant to the statutes, ordinances, regulations, policies,

customs, and practice of Westchester County, WCHCC, and/or State of New York. He is sued in his individual capacity.

18.     Defendant JUNE YOZZO, R.N., was at all times relevant herein, a licensed Registered Nurse and the Health Care Coordinator for WDOC, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and practice of Westchester County, WCHCC, and/or State of New York, as, with the specific responsibility of approving, denying, and facilitating medical procedures for inmates. She is sued in her individual capacity.

## NOTICE OF INTENT TO FILE SUIT

19.     Within ninety days of the events giving rise to Mr. Marrero's underlying claims, a written Notice of Claim was served upon Westchester County, WCHCC, and WMC. Over thirty days have elapsed since the filing of that notice, and this matter has not been settled or otherwise disposed.

20.     On May 6, 2010, Mr. Marrero underwent an examination pursuant to GML §50-h.

21.     Within ninety days of the events giving rise to the wrongful death claim, a written Notice of Claim was served upon Westchester County, WCHCC, and WMC. Over thirty days have elapsed since the filing of that notice, and this matter has not been settled or otherwise disposed.

22.     The examination of Mrs. Bektic-Marrero pursuant to GML §50-h has been noticed for April 28, 2011, at 10:00 am.

## JOINT LIABILITY

23.     This action falls within one or more of the exceptions set forth in CPLR § 1602.

## FACTS

24.     At all times relevant herein, Westchester County entered into written contracts with WCHCC, WMC, and/or NYMC to provide medical care and treatment to inmates of the Jail.

25.     On information and belief, neither Dr. Bailey-Wallace nor Dr. Goldberg is a board certified oncologist or throat specialist.

26.     On August 30, 2007, the U.S. Department of Justice ("DOJ") notified Andrew Spano of its intent to conduct an investigation of the Jail pursuant to CRIPA.

27.     From February 25-28, 2008, DOJ conducted an on-site inspection at the Jail with expert consultants in corrections and custodial medical care. DOJ conveyed preliminary findings to WDOC officials and legal counsel for the County at the close of the site visit. The consultants also provided on-site recommendations.

28.     On information and belief, Andrew Spano, Joseph Spano, Anthony Amicucci, Dr. Bailey-Wallace, and Dr. Goldberg were advised of DOJ's preliminary findings and on-site recommendations, by March 15, 2008.

29.     On information and belief, the preliminary findings were in sum and substance the same as those contained in DOJ's Findings Letter, published on November 30, 2009.

30.     The findings letter expressly provides, in part:

> III. Findings. We found that [WDOC] has a pattern of failing to: (2) provide inmates with adequate medical and mental health care. These deficiencies violate [WDOC] inmates' constitutional rights. Ex. A, p. 7.

> B. [T]here are some areas where the medical care provided at [WDOC] falls below the constitutionally required standards of care. Specifically, we found the following deficiencies: … an inadequate medical grievance process. Ex. A, p. 19.

3. Medical Grievance Process. Although [WDOC] has instituted a policy for submitting grievances, it is not consistently implemented or effectively publicized. According to the grievance Mechanism, CHS-A-11, inmate complaints must be written on an inmate grievance Form and submitted to [WDOC] staff. During our on-site visit, however, many of the corrections officers in [WDOC]'s housing units did not have Grievance Forms available for inmates if requested. Further, when inmates and jail staff were asked where an inmate could get a form to file a grievance, both the inmates and jail staff provided inconsistent responses.

Because inmates have no alternative options for health care other than the services provided them at [WDOC], it is important for inmates to have access to a medical grievance process. If an inmate perceives that his or her serious health needs are being unmet, the grievance process provides a mechanism to investigate the legitimacy of that concern. In order to be effective, however, a grievance policy must [be] made clear to prison staff and inmates. As noted above, [WDOC] staff and inmates are not aware of the procedures for filing a grievance, and inmates are unable to obtain grievance forms on their housing units. Without consistent access to grievance forms for inmates, the medical grievance process cannot operate as required. Ex. A, p. 23.

IV. Remedial Measures. In order to address the constitutional deficiencies identified above and protect the constitutional rights of detainees, the [WDOC] should implement, at a minimum, the following measures in accordance with generally accepted professional standards of correctional practice: Ex. A, p. 31.

B. Medical Care. 4. Access to Health Care. a. Ensure inmates have adequate access to health care. b. Ensure that the medical request process for inmates is adequate and provides inmates with adequate access to medical care. This process should include logging, tracking, and timely responses by medical staff. Ex. A, p. 38.

31.     On information and belief, WCHCC, WMC, NYMC, Andrew Spano, Joseph Spano and Anthony Amicucci failed to discipline at all, and improperly retained, defendants Dr. Bailey-Wallace, Dr. Goldberg and Nurse Yozzo based on the preliminary findings and recommendations of DOJ.

32.     On information and belief, from December 2008 through September 2009, Andrew Spano, Joseph Spano and Anthony Amicucci, knew, or, but for their deliberate indifference should have been aware, that defendants Dr. Bailey-Wallace, Dr. Goldberg, and

Nurse Yozzo, among others, were actively denying medical care to at least one other inmate with serious medical needs in the Jail.

33.     On information and belief, Andrew Spano, Joseph Spano and Anthony Amicucci failed to discipline at all, and improperly retained, defendants Dr. Bailey-Wallace, Dr. Goldberg and Nurse Yozzo for actively denying inmates their constitutional right to adequate medical care and treatment.

34.     On June 10, 2009, Mr. Marrero was committed to the custody of WDOC. Mr. Marrero was committed because his parole had been revoked due to a conviction of driving while intoxicated.

35.     During the intake process Mr. Marrero informed WDOC that he was a long-time and current smoker. Mr. Marrero also informed WDOC personnel that both his mother and sister suffered from cancer of the larynx.

36.     In September 2009, Mr. Marrero submitted a sick call slip complaining of a foreign object in his throat. Medical personnel examined the exterior of Mr. Marrero's throat and informed him that the malady would go away. Never was an oral examination performed or diagnostic tests prescribed.

37.     In September and October 2009, Mr. Marrero submitted several subsequent sick call slips regarding the unknown condition in his throat. In each sick call slip he explained that the condition in his throat not only remained, but that it was increasingly interfering with his ability to swallow and speak.

38.     Each time Mr. Marrero was seen by WDOC medical personnel, they responded by lightly touching his throat and telling him that it would go away, or it was probably just a

scratch or infection. Never to this date was an oral examination performed, antibiotics prescribed, or diagnostic tests prescribed.

39.     In or about October 2009, Mr. Marrero personally informed Dr. Goldberg that he was a smoker, and that both his mother and sister suffered from esophageal cancer.

40.     In October 2009, Mr. Marrero submitted additional sick call slips as the condition in his throat continued to worsen to the point that he could not swallow solid food, had difficulty swallowing water, and had severe difficulty speaking. Never was an oral examination performed or diagnostic tests prescribed.

41.     In response, Mr. Marrero's food was served to him puréed. However, he could not swallow his food in that consistency, either. Never was an oral examination performed or diagnostic tests prescribed.

42.     In late October 2009, Mr. Marrero was no longer able to swallow his medications for diabetes and hypertension. In response, WDOC medical personnel simply crushed the medication and mixed it with water for Mr. Marrero to consume. Never was an oral examination performed or diagnostic tests prescribed.

43.     From October through November 2009, Mr. Marrero was not provided food with the consistency necessary for his consumption. As a result, Mr. Marrero lost approximately thirty pounds within six weeks. Never were diagnostic tests prescribed. In short, Mr. Marrero was permitted to starve.

44.     In October and/or November 2009, several correction officers and civilian employees of Westchester County directed Mr. Marrero to report to the infirmary due to obvious signs of severe illness. Each time he reported to the infirmary Mr. Marrero was told by medical

personnel that the condition in his throat would go away. Never was an oral examination performed, or antibiotics prescribed.

45.     In November 2009, Mr. Marrero was switched to a liquid diet, but diagnostic tests were not prescribed.

46.     Subsequently, in November 2009, and only after Mrs. Bektic-Marrero made untold telephone calls to Dr. Bailey-Wallace, Dr. Goldberg, Nurse Yozzo, and other WDOC personnel, Mr. Marrero was given a barium swallow test. This was the first diagnostic test provided to Mr. Marrero despite nearly three continuous months of obvious signs of severe physical distress and medical need.

47.     The results of the barium swallow test were obtained the day the test was administered. Dr. Goldberg informed Mr. Marrero that the test revealed he had a mass in his throat and that "it may be cancer." However, Mr. Marrero was not referred to an oncologist.

48.     At about the time of the barium swallow test, Dr. Goldberg ordered blood tests for Mr. Marrero.

49.     The blood tests ordered by Dr. Goldberg were capable of detecting cancer.

50.     Dr. Goldberg received the results of said blood tests soon after Mr. Marrero's blood was drawn.

51.     The results of the blood tests revealed that Mr. Marrero had cancer, but he was not immediately informed of those results, nor was he referred to an oncologist.

52.     On November 30, 2009, Mr. Perez and Preet Bharara, US Attorney, SDNY, published the Findings Letter. *See* Ex. A. (Incorporated by reference and made a part hereof) Copies of the letter were delivered that day to defendants Andrew Spano and Joseph Spano, as well as the Westchester County Attorney.

53.     In early December 2009, approximately four weeks after the results of the barium swallow test were received by Dr. Goldberg and Dr. Bailey-Wallace, Mr. Marrero was scheduled for a CT scan at WMC.

54.     The results of the CT scan revealed that the mass in Mr. Marrero's throat was cancerous, but Mr. Marrero was not immediately informed of those results, nor was he referred to an oncologist.

55.     On December 12, 2009, Mr. Marrero presented at the WDOC infirmary, complaining of not being able to eat or swallow anything, including water, due to the mass in his throat. WDOC medical personnel informed Mr. Marrero not to worry as the mass would go away.

56.     A few hours after WDOC medical personnel informed Mr. Marrero that the mass in his throat would go away, even though the blood tests and CT scan revealed that the mass was cancerous, Mr. Marrero lost consciousness due to dehydration and malnutrition. He was admitted to I Block, a medical wing within the Jail, on an emergency basis.

57.     Only after Mr. Marrero was admitted to I Block on an emergency basis was he informed of the results of his CT scan.

58.     Mr. Marrero later met with Dr. Goldberg to discuss the results of his CT scan. Dr. Goldberg stated that he knew Mr. Marrero had cancer from the results of his blood tests, which were received several weeks earlier, and that Mr. Marrero had approximately six months to live.

59.     Mrs. Bektic-Marrero specifically asked Nurse Yozzo and other WDOC personnel for copies of her husband's medical records, in order to apply for restoration of parole and to seek a second medical opinion of her husband's condition, on behalf of her husband.

60.     Mrs. Bektic-Marrero's requests were intentionally denied and/or delayed by Nurse Yozzo and other WDOC personnel, even though Mrs. Bektic-Marrero submitted several HIPAA compliant medical releases.

61.     Mrs. Bektic-Marrero also made repeated and specific requests to Nurse Yozzo, that WDOC provide her husband with Ensure. Mrs. Bektic-Marrero even offered to provide cases of Ensure to WDOC and allow them to dispense it to her husband. Her requests were expressly denied by Nurse Yozzo.

62.     In about mid-December 2009, a biopsy was performed on the cancerous tumor in Mr. Marrero's throat, at WMC.

63.     The results of the biopsy revealed that the mass in Mr. Marrero's throat was Carcinoma, Stage IV, and identified the type of cancer from which he suffered.

64.     WMC also discovered on the day of the biopsy that Mr. Marrero had a second mass on his liver.

65.     Dr. Bailey-Wallace informed Mrs. Bektic-Marrero of the results of the biopsy weeks after they were obtained.

66.     Mr. Marrero was transferred to I Block and given fluids intravenously ("IV"), the day before each of his visits to WMC.

67.     On belief, the sole purpose and intent of said IVs was to obfuscate the true nature of Mr. Marrero's physical condition and conditions of confinement.

68.     On December 24, 2010, Mr. Marrero's medical records were provided to his former criminal defense attorney.

69.     In late December 2009 or January 2010, Mr. Marrero was transferred to Ward 29, a secure medical wing at WMC, staffed by WDOC personnel.

70.     Almost immediately after being admitted to Ward 29, WMC inserted a plastic tube into Mr. Marrero's stomach, through which he was fed Ensure.

71.     Mr. Marrero was subsequently scheduled for chemotherapy, but only after the fast growing cancerous tumor was permitted to mature to Stage IV.

72.     Defendants' intentional, reckless, careless, and/or negligent conduct from September 2009 through December 2009, resulted in Mr. Marrero's cancerous tumor metastasizing to Stage IV.

73.     The individual defendants knew or should have known that their actions violated clearly established law protecting the constitutional and statutory rights of Mr. Marrero.

74.     On January 29, 2010, the New York State Board of Parole restored Mr. Marrero's parole, and he was released from custody.

75.     In January and February 2010, Mr. Marrero received chemotherapy treatment from WMC, prior to and after being released from custody.

76.     In March 2010, Mr. Marrero sought and received chemotherapy treatment from the Veterans Administration Hospital, Castle Point, NY. Mr. Marrero was eligible for treatment at the VA Hospital by virtue of his status as an honorably discharged veteran of the U.S. Army.

77.     In May 2010, Mr. Marrero began treating at the Cancer Treatment Center of America, Philadelphia, PA ("CTCA").

78.     Mr. Marrero's treating physician at CTCA stated on several occasions that the treatment CTCA could and in fact did provide would have limited effects because Mr. Marrero's cancer had progressed to Stage IV.

Case 1:11-cv-01781-CM   Document 1   Filed 03/15/11   Page 14 of 66

79.     Mr. Marrero's treating physician at CTCA also stated on several occasions that Mr. Marrero's esophageal cancer would have been easily treatable if treatment had been provided in Stages I or II.

80.     On September 23, 2010, Mr. Marrero died due to causes related to cancer.

81.     Mr. Marrero's death has been exceptionally devastating on Mrs. Bektic-Marrero, because he also served as her eyes on a daily and hourly basis, as well as the primary overseer/guardian of their infant son, S.M.


## DAMAGES

82.     As a direct and proximate result of the defendants' misconduct Mr. Marrero suffered the following injuries and damages:

      A.  Violation of his rights pursuant to the Eighth and Fourteenth Amendments to the U.S. Constitution to be free from cruel and unusual punishment;

      B.  Conscious and needless physical pain and suffering;

      C.  Extreme emotional trauma and distress; and

      D.  Death.

83.     As a direct and proximate result of the defendants' misconduct, Mrs. Bektic-Marrero and S.M. suffered the following injuries and damages:

      A.  Loss of consortium during the last few months of Mr. Marrero's life;

      B.  Extreme emotional trauma and distress during the last few months of Mr. Marrero's life; and

      C.  Unbearable grief, sadness, depression, and anger as the result of Mr. Marrero's wrongful death.

84.     All the acts and omissions committed by the defendants described herein for which liability is claimed were done intentionally, unlawfully, wantonly, recklessly, or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## COUNT I

### § 1983 *Monell* Claim

85.     Plaintiffs hereby incorporate and reference all of the foregoing paragraphs and further allege as follows.

86.     Defendants Westchester County, Westchester County Health Care Corporation, Westchester Medical Center, and New York Medical College, through their policy makers, condoned, permitted encouraged, and/or ratified departmental policies, practices and/or customs to permit WDOC personnel to recklessly disregard serious medical needs of inmates and withhold medical treatment for such serious medical problems and there exists a pattern and practice in effect at the aforesaid WDOC wherein the defendants and their officials have failed to provide adequate medical treatment to the inmates at said WDOC.

87.     The aforementioned defendants themselves, and through their agents, acted with deliberate indifference to the rights of citizens to whom their employees were known to come into contact by failing to assess serious medical needs of inmates and provide treatment for serious medical problems.

88.     Upon information and belief, the aforementioned defendants themselves and through their agents, acted with deliberate indifference to the rights of citizens to whom the municipal employees were known to come into contact by creating financial incentives which encouraged its agents to deprive inmates of medical services.

89.     The policies or customs of the aforementioned defendants serve to ratify or tacitly authorize the unconstitutional actions of the employees and agents of the defendants caused Mr. Marrero to suffer constitutional deprivations and were the moving force behind said deprivations.

90.     The aforementioned defendants acted with deliberate indifference toward the constitutional rights of Mr. Marrero by failing to train or supervise staff in medical grievance procedures, and other procedures that do not violate said rights.

## COUNT II

### § 1983 Claim for Deliberate Indifference to Serious Medical Needs

91.     Plaintiffs hereby incorporate and reference all of the foregoing paragraphs and further allege as follows.

92.     As described above, defendants Dr. Bailey-Wallace, Dr. Goldberg, and Nurse Yozzo, acted with deliberate indifference to Mr. Marrero's serious medical needs, by among other things, failing to diagnose or treat Mr. Marrero's increasing inability to swallow food or water for nearly four consecutive months, despite the fact that defendants were aware of, or but for their deliberate indifference should have been aware of, Mr. Marrero's serious medical condition.

93.     Defendants consciously disregarded the medical risks posed by Mr. Marrero's inability to swallow food or water by among other things, failing timely to provide life saving diagnosis, and by only providing intravenous fluids prior to Mr. Marrero being transported to WMC for evaluation, thereby intentionally obfuscating his actual, daily medical condition while in the Jail.

94.     As a result, Mr. Marrero was injured.


## COUNT III

**Pendent Claims for Negligent Supervision, Training, Discipline and Retention**

95.     Plaintiffs hereby incorporate and reference all of the foregoing paragraphs and further allege as follows.

96.     The acts complained of herein resulted from defendants Andrew Spano, Joseph Spano, Anthony Amicucci, and Dr. Bailey-Wallace through their agents, servants and employees, breaching their duty to properly assign, train, supervise or discipline WDOC personnel, including medical personnel, in the proper use of the medical grievance process.

97.     Said defendants' failure to properly assign, train, supervise or discipline its employees, including personnel involved herein, constitutes acquiescence in and tolerance of ongoing unconstitutional conduct and created the atmosphere allowing the defendants to believe that they could, with impunity, subject Mr. Marrero to prolonged delay of essential medical care and treatment for a serious medical condition.

98.     Said defendants' failure to properly assign, train, supervise or discipline its employees, including personnel involved herein, constitutes acquiescence in and tolerance of ongoing unconstitutional conduct and created the atmosphere allowing the defendants to believe that they could, with impunity, allow Mr. Marrero to be repeatedly and continuously denied essential medical care and treatment for a serious medical condition.

99.     By reason of the foregoing, said defendants' agents, servants and employees failed and refused to use such care in the performance of their duties as reasonably prudent employees would have used under similar circumstances.

## COUNT IV

### Pendent Claims for Gross Negligence, and Intentional and Negligent
### Infliction of Emotional Distress

100.    Plaintiffs hereby incorporate and reference all of the foregoing paragraphs and further allege as follows.

101.    By their conduct, the actions of defendants Dr. Bailey-Wallace, Dr. Goldberg, and Nurse Yozzo were grossly negligent and negligent in that they had a duty of care for Mr. Marrero which they violated by repeatedly and intentionally inflicting severe pain arbitrarily, by repeatedly denying him essential diagnostic tests despite obvious signs of a serious medical condition, by denying him diagnostic tests or treatment despite having actual knowledge that Mr. Marrero had cancer, by denying him sufficient nutrition and fluids to maintain his physical health or approximate weight, and by failing to take steps that an ordinarily reasonable and prudent person would have pursued to care for and treat Mr. Marrero.

102.    Said defendants' conduct was outrageous and exceeded all reasonable bounds tolerated by a civilized society, and they engaged in said conduct with the specific intent to cause or disregard for a substantial probability of causing severe emotional distress.

103.    As a proximate and direct result of defendants' conduct, Mr. Marrero suffered the injuries and damages described above.

## COUNT V

### Pendent Claim for Medical Negligence

104.    Plaintiffs hereby incorporate and reference all of the foregoing paragraphs and further allege as follows.

105.    Defendants Westchester County, Westchester County Health Care Corporation,

Westchester Medical Center, New York Medical College, Dr. Bailey-Wallace, Dr. Goldberg, and Nurse Yozzo knew or should have known Mr. Marrero, among other things, required testing, examinations, evaluations, and/or treatment as a result of his condition.

106.    Said defendants treated and cared for Mr. Marrero in a careless and negligent manner and deviated from accepted standards of care and treatment therein by failing to provide any timely determinative diagnosis.

107.    Mr. Marrero was caused to be injured, and to undergo pain and suffering as a result of the negligence, carelessness and medical negligence of said defendants.

## COUNT VI

### Pendent Claim for *Prima Facie* Tort

108.    Plaintiffs hereby incorporate and reference all of the foregoing paragraphs and further allege as follows.

109.    By their actions as set forth above, Dr. Bailey-Wallace, Dr. Goldberg, and Nurse Yozzo, inflicted the harm described above upon Mr. Marrero, without excuse or justification, out of disinterested malevolence.

110.    As a proximate and direct result of defendants' conduct, Mr. Marrero suffered the injuries and damages described above.

## COUNT VII

### Pendent Claim for *Respondeat Superior*

111.    Plaintiffs hereby incorporate and reference all of the foregoing paragraphs and further allege as follows.

112.    At all relevant times the employees of defendants Westchester County, Westchester County Health Care Corporation, Westchester Medical Center, and New York Medical College were acting for, upon and in furtherance of the business of their employer and within the scope of their employment.

## COUNT VIII

### Pendent Claim for Wrongful Death

113.    Plaintiffs hereby incorporate and reference all of the foregoing paragraphs and further allege as follows.

114.    As a direct and proximate result of defendants' reckless, negligent and/or careless acts or omissions, Mr. Marrero suffered severe conscious pain and suffering, and serious injuries which ultimately resulted in his death on September 23, 2010.

115.    As a direct and proximate result of the foregoing Mrs. Bektic-Marrero and her infant son S.M., were deprived of guiding eyes, financial support, care, support, love and affection of Mr. Marrero.

116.    By reason of the foregoing, Mrs. Bektic-Marrero, as Administratrix of the Estate of Jose R. Marrero, has been damaged. As a direct and proximate result of defendants' acts and omissions, Mrs. Bektic-Marrero and her infant son S.M., were damaged in an amount in excess of all jurisdictional limits of lower courts which may have otherwise had jurisdiction, and they make a claim for those damages and punitive damages.

## COUNT IX

## Pendent Claim for Loss of Consortium

117.    Plaintiffs hereby incorporate and reference all of the foregoing paragraphs and further allege as follows.

118.    At all times relevant Mrs. Bektic-Marrero was the lawful spouse of Mr. Marrero and, as such, was and is entitled to the comfort, enjoyment, society and services of her spouse. By reason of the foregoing conduct by all named defendants, Mrs. Bektic-Marrero was deprived of the comfort and enjoyment of the services and society of her spouse, which are guaranteed to her under the laws and constitution of the State of New York and can be adjudicated in this litigation under the Court's supplementary jurisdiction. Moreover, the conduct of all named defendants' undermined Mrs. Bektic-Marrero's liberty interest in preserving the integrity and stability of the marital relationship from intervention by the state without due process of law.

WHEREFORE, plaintiffs request the following relief:

A.    Declaratory judgment that Mr. Marrero's rights under the U.S. Constitution were violated;

B.    Compensatory damages as the jury may determine;

C.    By reason of wanton, willful and malicious character of the conduct complained of herein, punitive damages as the jury may determine;

D.    Presumptive damages as the jury may determine;

E.    Award of attorney's fees, costs, and disbursements;

F.      Such other and further relief as to the Court seems just and proper.


Dated: March 13, 2011
          Ossining, New York

                                          /S/ Michael A. Deem
                                         Michael A. Deem (MD8158)
                                         Attorney for Plaintiffs
                                         95 Croton Avenue, Suite 37-T
                                         Ossining, NY 10562
                                         (914) 502-0395

## DECLARATION UNDER PENALTY OF PERJURY

I am the plaintiff in the above entitled action, the Complaint has been read to me by my attorney, and I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. §1746. Executed on March 13, 2011.


   /S/ Nina Bektic-Marrero
NINA BEKTIC-MARRERO

*Bektic-Marrero v. Goldberg, et al.*

# Exhibit A

**U.S. Department of Justice**

Civil Rights Division

*Assistant Attorney General*
*950 Pennsylvania Avenue, NW - RFK*
*Washington, DC  20530*

November 19, 2009

The Honorable Andrew J. Spano
County Executive
938 Michaelian Office Building
148 Martine Avenue
White Plains, NY  10601

> RE:   CRIPA Investigation of the Westchester County Jail,
> Valhalla, New York

Dear Mr. Spano:

We write to report the findings of the investigation of the Civil Rights Division and the United States Attorney's Office into conditions at the Westchester County Jail ("WCJ" or "the Jail"). On August 30, 2007, we notified you of our intent to conduct an investigation of WCJ pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997. As we noted, CRIPA gives the Department of Justice authority to seek a remedy for a pattern or practice of conduct that violates the constitutional rights of incarcerated persons.

On February 25-28, 2008, we conducted an on-site inspection at WCJ with expert consultants in corrections and custodial medical and mental health care. We interviewed Jail staff in administration, security, medical and mental health, facilities management, and training. We also interviewed inmates. Before, during, and after our visit, we reviewed an extensive number of videos and documents, including policies and procedures, orientation and staff training materials, and unit logs. We also reviewed numerous internally prepared Jail reports involving incidents, uses of force, investigations, and disciplinary matters. In keeping with our pledge of transparency and to provide technical assistance where appropriate, we conveyed our preliminary findings to WCJ officials and legal counsel for Westchester County (the "County") at the close of our site visit.

We thank the staff at WCJ for their helpful and professional conduct throughout the course of the investigation. The County provided us with access to records and personnel, and responded to our requests, before, during, and after our on-site visit in a forthcoming manner. We also appreciate the County's

- 2 -

receptiveness to our consultants' on-site recommendations.  Accordingly, we have every reason to believe that the County is committed to remedying all known deficiencies at WCJ.

Consistent with the statutory requirements of CRIPA, we now write to advise you of the findings of our investigation, the facts supporting them, and the minimum remedial steps that are necessary to address the deficiencies we have identified.  See  42 U.S.C. § 1997b.  As described more fully below, we conclude that certain conditions at WCJ violate the constitutional rights of inmates.  In particular, we find that inmates confined at WCJ are not adequately protected from harm, including physical harm from use of excessive by staff.  In addition, we find that inmates do not receive adequate medical and mental health care.[1]

As discussed in this letter, these conditions have resulted in serious harm to WCJ inmates.  The number of serious incidents discussed herein indicates that WCJ is not adequately providing for the safety and well-being of the inmates.

## I. __BACKGROUND__

The WCJ is located in Valhalla, New York, within Westchester County.  The Jail comprises three divisions which house pre-trial detainees and sentenced inmates:  the Jail Division,[2] the Penitentiary Division,[3] and the Women's Unit.[4] The Jail has an operating capacity of 1,693 beds, and employs approximately 900 uniformed and civilian employees.  During our visit there were 1400 inmates detained at the Jail.

---

[1]      This letter does not encompass any findings or conclusions with respect to whether WCJ has violated the provisions of Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 et seq., and the Department of Justice's implementing regulation, 28 C.F.R. Part 35.

[2]      The Jail Division houses pre-trial and sentenced inmates who have sentences of more than one year, but who are awaiting transfer to the New York State Department of Correctional Services ("NYSDCS").

[3]      The Penitentiary Division houses male inmates with sentences of less than one year.

[4]      The Women's Unit houses pre-trial and sentenced female inmates with sentences of less than one year, and female inmates who have been sentenced to prison terms exceeding one year but are awaiting transfer to the NYSDCS.

- 3 -

## II.  LEGAL STANDARDS

CRIPA authorizes the Attorney General to seek injunctive relief to enforce the constitutional rights of inmates subject to a pattern or practice of unconstitutional conditions in jails and prisons.  42 U.S.C. § 1997a.

Prison administrators are constitutionally required "to take reasonable measures to guarantee the safety of inmates."  Hudson v. Palmer, 468 U.S. 517, 526 (1984).  When a jurisdiction takes a person into custody and holds him against his will, the Supreme Court has held that the Constitution "imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  County of Sacramento v. Lewis, 523 U.S. 833, 851 (1998) (quoting DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 199-200 (1989)); see also Harris v. Westchester County Dept of Corr., No. 06 Civ. 2011 (RJS), 2008 WL 953616, at *6 (S.D.N.Y. Apr. 3, 2008).

### A.    Protection From Harm

The Eighth and Fourteenth Amendments protect inmates and pre-trial detainees from present, continuing, and future harm.  See Hudson v. McMillian, 503 U.S. 1 (1992); Farmer v. Brennan, 511 U.S. 825, 832 (1994); see also United States v. Walsh, 194 F.3d 37, 48 (2d Cir. 1999) ("the right of pre-trial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment") (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979) (citations omitted).  While the constitutional rights of convicted prisoners and pre-trial inmates are guaranteed under different constitutional norms, courts have consistently held that pre-trial detainees "retain at least those constitutional rights . . . enjoyed by convicted prisoners [under the Eighth Amendment]."  Bell, 441 U.S. 520 at 545; Benjamin v. Fraser, 343 F.3d 35, 50 (2d Cir. 2003) ("under the Due Process Clause, [pre-trial detainees] may not be punished in any manner – neither cruelly and unusually nor otherwise"); see also Cuoco v. Moritsugu,   222 F.3d 99, 106 (2d Cir. 2000) (noting that courts apply the "Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment); Weyant v. Okst, 101 F.3d 845 (2d Cir. 1996).

The Eighth and Fourteenth Amendments forbid excessive physical force against inmates and pre-trial detainees.  See Hudson, 503 U.S. 1; Farmer, 511 U.S. at 832; see also Walsh, 194 F.3d at 48; Brown v. Doe, 2 F.3d 1236, 1242 n.1 (2d Cir. 1993) ("After conviction, the Eighth Amendment 'serves as the primary source of substantive protection . . . in cases . . . where the deliberate use of force is challenged as excessive and unjustified.'") (citations omitted).  Constitutional standards also apply even when the use of force does not result in significant injury.

- 4 -

See Walsh, 194 F.3d at 48.  Allegations of excessive force are evaluated under two components:  "(1) a subjective component which focuses on the defendant's motive for his conduct; and (2) an objective component which focuses on the conduct's effect."  Jeanty v. County of Orange, 379 F. Supp. 2d 533, 540 (S.D.N.Y. 2005) (citing Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000)).

Under the subjective component, courts examine whether the force applied was applied "maliciously and sadistically to cause harm" rather than "applied in a good-faith effort to maintain or restore discipline."  Jeanty, 379 F. Supp. 2d at 540 (quoting Hudson, 503 U.S. at 7, and citing Blyden v. Mancusi, 186 F.3d 252, 262-63 (2d Cir. 1999)) (internal quotation marks omitted).  In determining whether excessive force was used, courts examine a variety of factors, including:

> [T]he need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.

Hudson, 503 U.S. at 7 (internal quotation marks and citation omitted); see also Jeanty, 379 F. Supp. 2d  at 540 (citing Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003)).  Under the objective component, courts examine whether the force applied was "sufficiently serious by objective standards."  Id. (quoting Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999)) (internal quotation marks omitted).  Although the malicious and sadistic use of force by prison officials violate contemporary standards of decency, the Second Circuit has held that "not every push or shove . . . violates a prisoner's constitutional rights."  Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997) (internal quotation marks omitted).  However, "a showing of extreme injury is not required to bring an excessive force claim if the alleged conduct involved unnecessary and wanton infliction of pain."  Jeanty, 379 F. Supp. 2d at 540 (quoting Sims, 230 F.3d at 21-22 (quoting Hudson, 503 U.S. at 10)) (internal quotation marks omitted).

It is widely recognized that jail officials bear an affirmative duty to intercede on behalf of an inmate when the officer witnesses other officers using excessive force against the inmate.  See Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994); Sims v. Griener, No. 00 Civ. 2524 (LAP), 2001 WL 1142189, at *5 (S.D.N.Y. Sept. 27, 2001); see also Allen v. City of New York, 480 F. Supp. 2d 689 (S.D.N.Y. 2007) (holding that a prisoner could proceed with claim that officers failed to intervene when a fellow officer subjected the inmate to excessive force).  "The duty arises if the officer has a reasonable opportunity to intercede."  Jones v. Huff, 789 F. Supp. 526, 535 (N.D.N.Y. 1992) (citing O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988)).

- 5 -

The right to be protected from harm includes the right to be reasonably protected from constant threats of violence.  See Farmer, 511 U.S. at 833.  Prison officials have a duty to protect inmates from harm caused by other inmates and from excessive physical force by correctional staff.  See id.; see also Ayers v. Coughlin, 780 F.2d 205, 209 (2d Cir. 1986).  In determining whether conduct rises to the level of a constitutional violation, the Second Circuit requires that the "prison official have 'knowledge that an inmate faces substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate the harm.'"  Patrick v. Amicucci, No. 05 Civ. 5206 (GEL), 2007 WL 840124, at *5 (S.D.N.Y. Mar. 19, 2007) (quoting Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996)).  The Second Circuit also requires that "an injured inmate . . . show not only that he was exposed to a substantial risk of serious harm but also that the defendant officials acted with deliberate indifference to his health or safety."  Patrick, 2007 WL 840124, at *3 (citing Farmer, 511 U.S. at 837).  Liability arises where an official knew of and disregarded "an excessive risk to inmate health or safety [and is both] aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference."  Id.  Prison officials have been found liable when "they are on notice of a substantial risk of serious harm to an inmate and fail to take reasonable steps to protect him [or her]."  Id.; see also Hayes, 84 F.3d at 621 (reversing summary judgment on behalf of prison officials where genuine issues of material fact remained as to officials' knowledge of the substantial risk of harm to inmate).

## B.  Medical Care

A prison official's deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment.  See  Estelle v. Gamble, 429 U.S. 97, 104 (1976); Hathaway v. Coughlin,  37 F.3d 63, 66 (2d Cir. 1994); Odom v. Kerns, No. 99 Civ. 10668 (KMK) (MHD), 2008 WL 2463890, at *6 (S.D.N.Y. June 18, 2008).  Pre-trial detainees are protected against deliberate indifference to their serious medical needs under the Fourteenth Amendment.  See Harris, 2008 WL 953616, at *6 ("Pretrial detainees' claims concerning the alleged denial of adequate medical care also implicate the Due Process Clause . . . . The Second Circuit has found that an unconvicted detainee's rights are at least as great as those of a convicted prisoner.") (quoting Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996)).  Thus, "the official custodian of a pretrial detainee may be found liable . . . if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need."  Id. (quoting Weyant, 101 F.3d at 856).

"Deliberate indifference" involves both an objective and a subjective component.  The objective component is met if the deprivation is "sufficiently serious."  Farmer, 511 U.S. at 834.  Prison officials may not refuse, unreasonably delay, or intentionally interfere with medical treatment for incarcerated

- 6 -

individuals.  When an inmate complains about a delay in treatment, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care . . . that is relevant for Eighth Amendment purposes."  <u>Smith v. Carpenter</u>, 316 F.3d 178, 186 (2d Cir. 2003); <u>see</u> <u>also</u> <u>Blaylock v. Borden</u>, 547 F. Supp. 2d 305, 310-11 (S.D.N.Y. 2008).

Prison officials also may not provide an easier but less effective course of treatment nor may they offer only cursory medical care when the need for more serious treatment is obvious.  <u>See</u> <u>Estelle</u>, 429 U.S. at 104-05.  Failure to provide adequate medical care to address an inmate's serious medical needs may constitute a constitutional violation.  <u>See</u> <u>Jones v. Westchester County Dep't of Corr. Med. Dep't</u>, 557 F. Supp. 2d 408, 413-14 (S.D.N.Y. 2008).

A jail's obligation to provide adequate medical care includes a duty to provide adequate mental health care.  <u>See</u> <u>Langley v. Coughlin</u>, 888 F.2d 252, 254 (2d Cir. 1989) ("We think it plain that from the legal standpoint psychiatric or mental health care is an integral part of medical care"); <u>accord</u> <u>Atkins v. County of Orange</u>, 372 F. Supp. 2d 377, 408 (S.D.N.Y. 2005) ("In the Second Circuit, it is equally clear that psychiatric or mental health care 'is an integral part of medical care'") (citing <u>Langley</u>, 888 F.2d at 254), <u>aff'd</u>, 248 Fed. Appx. 232 (2d Cir. 2007).  Where a jail's "actual practice" towards treatment of mentally ill inmates is clearly inadequate, the facility may be held to be "on notice" at the time of an inmate's incarceration that there is a substantial risk of deprivation of necessary care. <u>Woodward v. Corr. Med. Servs. of Ill., Inc.</u>, 368 F.3d 917, 927 (7th Cir. 2004).

In addition, detainees have a right to be free of bodily restraints, such as shackles or a restraint chair, unless the facility demonstrates a legitimate penological or medical reason for the restraint.  <u>See</u>, <u>e.g.</u>, <u>Washington v. Harper</u>, 494 U.S. 210, 220-23, 236 (1990) (prison may forcibly administer anti-psychotic drugs if supported by legitimate penological or medical reasons, despite inmate's liberty interest in avoiding forced medication); <u>Doe v. Dyett</u>, No. 84 Civ. 6251 (KMW), 1993 WL 378867, at *2-3 (S.D.N.Y. Sept. 24, 1993) (holding that forced administration of medicine to inmate "jeopardizing his own or the institution's safety . . . does not amount to a due process violation").  Restraints imposed by correctional officers that are medically unjustifiable and have no adequate security rationale infringe on an inmate's due process rights.  <u>See</u> <u>Smith v. Coughlin</u>, 748 F.2d 783, 787 (2d Cir. 1984) (holding that restraints on inmates must be supported by "penological justification").

- 7 -

## III.  FINDINGS

We found that WCJ has a pattern of failing to:  (1) adequately protect inmates[5] from harm and serious risk of harm from staff; and (2) provide inmates with adequate medical and mental health care.  These deficiencies violate WCJ inmates' constitutional rights.

### A.     INADEQUATE PROTECTION FROM HARM

Although the violence present in any correctional setting necessarily permits an appropriate use of force, the Eighth Amendment forbids excessive physical force against prisoners.  Hudson, 503 U.S. at 9.  Corrections officials must take reasonable steps to guarantee inmates' safety and provide "humane conditions" of confinement, including taking reasonable steps to protect inmates from physical abuse and use of excessive force.  Farmer, 511 U.S. at 832-33.  Providing humane conditions requires that a corrections system must satisfy inmates' basic needs, such as their need for safety.  To ensure reasonably safe conditions, officials must take measures to prevent the use of unnecessary and inappropriate force by staff.  Officials must also provide adequate systems to investigate incidents of harm, including staff misconduct and alleged physical abuse of inmates.  As illustrated below, WCJ fails to provide constitutionally adequate protection from harm for its inmates.

### 1.     Use of Excessive Force By WCJ Staff

We found evidence of a pattern and practice of use of excessive force by the Emergency Response Team ("ERT").[6]  Although an appropriate use of force in a correctional setting is permissible and often necessary to adequately ensure staff and inmate safety, the  law forbids excessive physical force against inmates.  A determination of whether force is used appropriately requires an evaluation of the need for the use of force, the relationship between that need and the amount of force used, the seriousness of the threat reasonably believed to exist, and efforts made to temper the severity of a forceful response.  Hudson, 503 U.S. 1 at 7.

---

[5]     From here forward, both pre-trial detainees and convicted prisoners will be called "inmates."

[6]     The ERT is a team of correction officers and supervisors who respond to incidents such as inmate-on-inmate and inmate-on-staff assaults.  Each ERT comprises several correctional officers protected in full riot gear and helmets, and falls under the command of the Emergency Services Unit ("ESU").

- 8 -

Generally accepted correctional practices provide that appropriate uses of force in a given circumstance should be proportionate to the threat posed by the inmate.  Absent exigent circumstances, lesser forms of intervention, such as issuing disciplinary infractions or employing passive escorts, should be used or considered prior to more serious and forceful interventions.

However, and as detailed below, our review of videotaped use of force incidents reflect a pattern and practice in which the ERT uses excessive force against inmates.  In the videos we reviewed, ERT officers are seen shoving inmates aggressively into fixed objects when less injurious tactical holds could be safely employed.  The officers are seen routinely applying needlessly painful escort techniques (bent wrist locks while apparently applying intense pressure).  The officers are also seen routinely employing crowd control contaminants (MK-9 in a 16 ounce canister) when they are tactically contraindicated rather than utilizing an equally effective personal size canister (MK-4 in a three ounce canister).[7]  Also troubling is the fact that the ERT officers often seem to disregard some inmates' mental impairments in use of force incidents, which appears to greatly heighten the volatility of a given situation.  Indeed, they utilize threatening and aggressive verbal strategies, which tend to escalate rather than de-escalate a potentially volatile situation.

In arriving at our findings, we reviewed hundreds of WCJ use of force incidents from 2006-2007, dozens of which were captured on videotape.  This review revealed a failed administrative review process at WCJ and a pattern and practice of the ERT to engage in needlessly aggressive and injurious force against inmates.  We are concerned both about the nature and severity of the force used by the ERT, and the paucity of the subsequent investigations, particularly where the evidence clearly indicates that supervisory review and/or investigations were warranted.  The following are but some of the incidents that highlight these deficiencies.

- On January 11, 2007, AA, a 38-year-old female, refused orders to lock-in her cell.[8]  According to the sole ERT report written for this incident, ERT "attempted to take control of AA but she resisted.  ERT then took control of her and placed her in restraints."  The report indicates that AA was then escorted to a search area where she "became very combative," at which time [Oleoresin Capsicum] ("OC") spray was

---

[7]     During our tour of WCJ, we brought the problematic use of MK-9 canisters to the attention of WCJ management and understand that a memorandum directing the discontinuance of such tactic was issued.

[8]     To protect inmates' identities, we use fictitious initials throughout this letter.

administered.[9]  It appears that the report was reviewed by a sergeant directly involved in the incident.  A video of this incident was recorded; we found no evidence that the video was ever reviewed by an independent supervisor.

In our review of the video of this incident, we found that not only did the report inaccurately characterize the force used against AA, but also that the force used was excessive.  Our review of the video indicates that what the officer reported as "taking control" of AA was really the ERT officer driving AA's head to a wall while other officers took her to the ground to apply handcuffs and leg restraints. We also observed that AA was escorted with a bent wrist tactic, which appeared to cause her substantial and unnecessary pain.  Finally, we are concerned that AA was sprayed, at point blank range, in the face with OC spray from a MK-9 canister while she was lying prone and cuffed on the floor.[10]

- In another use of force report, also dated January 11, 2007, a WCJ officer described the incident as follows:  "ERT entered the inmate receiving holding cell and attempted to restrain inmate [AB] who resisted ERT."

Our review of the video of this incident showed that the ERT entered a holding cell where AB and several other inmates were housed, and ordered them to place their hands on the wall.  The video shows that AB complied.  The video then shows that an ERT officer ordered AB to his knees; while he was attempting to kneel, he was thrown into the wall, causing a wound to open over his eye.  Inmate AB was then cuffed and escorted with a bent wrist technique to receive medical aid. We were troubled to see this use of excessive force used against a compliant inmate who did not appear to pose a threat to officers or himself.  Indeed, the video does not suggest that the force used was justifiable or necessary to achieve a legitimate penological interest.  This incident should have been reviewed and investigated by the Special Investigations Unit ("SIU") to assess the appropriateness of the use of force used; we found no evidence that it was.[11]

---

[9]     OC spray, commonly known as pepper spray, is a chemical agent that irritates the eyes and respiratory system of a target.

[10]     MK-9 canisters are often employed for crowd control situations, and pose a serious risk of unnecessary harm when used on a restrained individual at point blank range, as was done in this incident.

[11]     The SIU is assigned the responsibility for investigating "any serious allegation regarding the inappropriate or unlawful use of physical force or deadly physical force by an employee."  See SOP  II 07-02.

- 10 -

- During a February 14, 2008, strip search of AC, the ERT took him to the ground and sprayed him in the face with an MK-9 canister. The sole report filed for this incident alleged that AC "became combative," and thus the MK-9 was used.

In our review of the video, it did not appear that AC was combative during the strip search. In fact, AC was compliant with the officers' commands. We interviewed AC, and his recollection of the incident is consistent with our viewing of the video.

- On May 22, 2007, inmate AD was ordered to be placed on suicide watch from the booking area where he was housed. When AD refused orders to comply, the sole use of force report for this incident, written by an ERT sergeant, described the incident as follows: "necessary force was used and the inmate was placed in full restraints."

Our review of the video of this incident shows the ERT rushing AD, knocking him against the wall and to the floor. We did not observe any indication that AD was combative. As a result, AD sustained a bloody nose and a lip laceration. We fail to see that this force was "necessary" as described in the report, especially in light of the fact that 8-10 officers responded to handle this incident. This incident should have been referred for investigation rather than addressed in a conclusory report that the force was necessary. We found no evidence that any supervisor conducted any form of review.

- Following a September 17, 2007, use of force incident with inmate AE, an ERT sergeant wrote a report in which he described AE as "violently resisting" the attempts of team members to cuff him necessitating a "one second burst of [OC] to halt his violent behavior."

The video shows that AE was in a fully prone, face down position, and surrounded by the ERT when a MK-9 canister appears on camera and is discharged at point blank range in AE's face. In an interview with AE, he claimed to have been struck with a closed fist while in the prone position. The tape also shows one of the ERT officers dragging AE along the floor by his handcuffs. Even a casual review of this video should have prompted some level of investigative inquiry because the video showed that unsafe and highly injurious tactics were used against AE by members of the ERT.

- On October 16, 2007, inmate AF was ordered to be placed on a suicide watch. The ERT sergeant who prepared the use of force report

- 11 -

conclusorily described AF as "combative" and in a "blind rage." On the video tape, the sergeant repeatedly describes AF as "highly combative." He claimed he used OC spray to "halt his rage."

In our review of the 40-plus minute video of this incident we found the use of a chemical agent inappropriate, claims of resistance exaggerated, and ERT's tactics unsafe and unprofessional. When the tape begins, AF, already restrained, is taken nude to a holding cell and placed in a painful escort position, at which time he cries out and is told to "shut up." AF is then bent over causing him to have difficulty breathing; AF is visibly bleeding. AF is then taken to receive medical attention and thereafter escorted in a needlessly painful manner to the forensic unit where he is thrown on the bed of the cell. AF repeatedly asks for water and is again told to "shut up." While lying face down in a prone position under the total control of ERT officers and lying still, he is told to stop resisting or chemical agents will be used. He is then thrown to the floor at which time the sergeant, utilizing a MK-9 canister, sprays AF with OC spray at point blank range.

Next, the ERT exits and secures the cell door. Inmate AF's movements about the cell appear to be reactions to the OC spray. It is these reactions that the ERT sergeant describes as "extremely combative" behavior. The ERT re-enters the cell and places the subject in four-point restraints during which time officers apply their body weight in an unsafe manner on his legs and chest.[12] As nurses enter to treat AF, an officer can be heard to say "he ain't getting nothing." The following day a watch commander directed a memo to the warden recommending that the video of this incident be ". . . accessed and examined." We found no evidence that such a review was ever conducted.

- On September 22, 2007, inmate AG, described as "nervous and paranoid" by WCJ staff, was strip searched although he "had to be constantly physically directed using soft hand techniques to complete the search." After the strip search he was left unrestrained in the cell. According to the report, the ERT returned to move AG to booking for a suicide watch. He was ordered to "kneel down against the back wall of the cell in the compliance position." He did not comply and OC spray was dispersed through the cuff port of the cell door.[13] The door was

---

[12]    Applying such weight on an individual poses significant risks of positional asphyxia. Positional asphyxia is known to restrict breathing, and in some cases, cause death.

[13]    A "cuff port" is a small opening on the front of a cell that has a secure flap through which a food tray may be passed or hands presented by a detainee for cuffing.

- 12 -

then opened and he immediately fell to the ground face down in a prone position and was once again restrained.

We conclude that WCJ unjustifiably used OC spray on AG. Inmate AG does not appear combative in the video, and appears disoriented. An officer on the video can be heard to say that AG has "trouble with commands." Of particular concern, as the sergeant disperses the OC spray, a female voice can be heard to say "he's got asthma." A review of this video should have prompted an investigative inquiry on whether the use of OC spray was contraindicated both because of his mental state and the possibility that he had asthma.

   •   The reporting ERT captain in a June 18, 2007, use of force report summarized an incident with inmate AH as follows: "During the search, detainee was not complying with numerous orders. He refused to remove his clothing and he disobeyed orders to face the rear wall. He became combative and resistive. His actions necessitated him being restrained. Chemical agents were deployed in order to regain control and compliance."

Our review of this incident is inconsistent with the captain's report. First, AH, who has a history of psychiatric disorders, appears compliant with the series of specific orders he was given to remove his clothing. Second, as AH was ordered to remove his underwear, an officer immediately took him to the floor of the cell, where AH was sprayed with OC from a MK-9 canister. The video does not corroborate the ERT captain's report that AH was combative. Of particular note, as AH is prone on the floor, the video shows that a sizeable pool of blood begins to grow from the open wound to his head he sustained during the use of force.[14] Given the injuries AH sustained, and the questionable use of the MK-9, an investigation should have been conducted. We found no evidence that an investigation was conducted.

   •   On April 20, 2007, inmate AI refused to lock-in her cell, as ordered. The ERT responded. The reporting sergeant described the use of force incident as follows: AI "became combative and started kicking and cursing ERT" when they attempted to place her in restraints. Once in restraints she was escorted to the elevator at which time she "dropped to the floor and was non-responsive." After exiting the elevator she

---

[14]    Notably, AH was unable to make his court-mandated appearance as he had to be taken to the hospital for treatment of the serious head wound.

- 13 -

> was taken to a medical station where "she was evaluated medically and psychologically . . . During the evaluation inmate [AI] attempted to spit on staff.  Because of her actions, a spit hood was placed on her."

Our review of the 23-plus minute video of this incident reveals discrepancies between the sergeant's report and the video.  First, the video does not support the sergeant's claim that AI was "combative" and "kicking" during the initial restraint.  AI in fact is shown cooperating with officers but was asking to speak with a supervisor.  As AI is placed on the elevator, she is thrust against the elevator walls with officers pressing against her as she cries out in pain, claiming officers hit her head.  She drops to the floor and is suddenly quiet.  As AI is removed from the elevator, she again asks to speak to a sergeant.  As the officers pick her up and begin to escort her with a bent wrist hold she cries out in pain saying "you are hurting my wrist."  Once AI arrives at the medical station, officers place her hands in a painful position over the back of a chair.  AI again cries out in pain, and requests that medical personnel examine her wrist.  The video provides no evidence that medical personnel examined her wrists.[15]  This incident should have been thoroughly investigated, especially given the graphic evidence that can be seen throughout the course of the video.  We found no evidence that a supervisor was called to the scene or that an investigation was conducted.

### 2.    Inadequate Review of Use of Force Incidents

We found that WCJ inadequately reviews use of force incidents to prevent a pattern of use of excessive force against inmates.  As a result, staff who subject inmates to excessive force are not adequately identified, nor are appropriate remedial measures taken.

Our review of numerous use of force incidents indicated that WCJ's Use of Force Standard Operating Procedures ("SOP") concerning administrative review of use of force incidents was not followed.  In an interview with the SIU Commander during our site inspection, he advised that his unit did not initiate any use of force investigations in 2007, nor were any use of force incidents referred to his unit for the year.  Furthermore, in the course of our tour of the facility, we were unable to identify a supervisory official independent of the ERT who is responsible for

---

[15]    The video shows that AI consistently requested medical attention for the pain in her wrist.  After leaving the medical area, AI is escorted to booking and continues to cry out in pain.  After she is turned over to the female officers for the strip search she becomes compliant but continues to cry of pain from her wrist.  After the strip search, the ERT re-enters the room and re-cuffs her for the short distance to the suicide watch cell while she cries out in pain.

reviewing incident videos.  Instead of SIU or other independent review, we found that first line supervisors of the ERT routinely signed off on use of force reports without comment.  Of particular concern, we found that supervisors frequently review their own actions when involved in use of force incidents.[16]  Failure to review uses of force effectively provides Jail Staff with unfettered use of force.  As a result, WCJ is unable to adequately protect its inmates from harm.

Indeed, in 2007, only two investigations of use of force incidents were completed by jail security administrators.  Neither of these investigations were initiated by WCJ officials.  One investigation was conducted only after an inmate, DU, filed suit against WCJ.  The second resulted from a referral from the Westchester County District Attorney's Office regarding allegations of an inmate, DV, concerning excessive force.  We found no evidence that WCJ officials initiated investigations prior to the referrals.  Further, we were concerned about the adequacy of these two investigations.  One of the two investigations appears to be simply a cursory review of the detainee's complaint.  The second investigation failed to address or investigate a questionable use of crowd control contaminant.[17]

### 3.   Inadequate Use of Force Documentation

Effective measures to prevent excessive and inappropriate uses of force start with the adequate reporting of information, which permits the identification of potential problem cases and effective internal investigations.  We find that WCJ fails to adequately document uses of force in its written reports, and thus fails to adequately protect inmates from harm.  In light of discrepancies between the video we reviewed and the written reports noted above, we are concerned with the inadequate documentation on other uses of force where no videos were present.

We begin by noting that WCJ fails to maintain an adequate use of force reporting mechanism.  Notably, WCJ's Use of Force SOP V 01-09 (April 25, 2002) does not contain a generally applicable reporting requirement for correction officers who use force on inmates or witness correction officers' use of force on inmates.  Similar to the deficiencies we observed in the video, we were unable to identify a supervisory official outside of the ERT who is responsible for reviewing incident reports.  As noted above, the commander of the SIU told us during our tour that his unit did not conduct any use of force investigations for 2007.  Compounding these deficiencies, while the SIU receives copies of all special reports, they are reviewed for informational purposes only.  The SIU does not have any guidelines or criteria

---

[16]     See  Westchester County Document Submission.

[17]     The litigation file revealed that these two use of force incidents were not investigated prior to the commencement of litigation.

- 15 -

for reviewing use of force incidents, and WCJ does not contain a standardized use of force reporting form.

Many WCJ officers simply fail to document uses of force, or do so inadequately.  Our review of all use of force incidents for 2007 indicate that WCJ officers routinely file incomplete, vague, or conclusory reports.  As noted above, our review also indicates that in some instances exaggerated reports are filed as well.  The following reports are so inadequate that they do not allow a substantive review of the incidents by senior officials, and may fail to disclose critical information.  For example:

- Only one of the two officers involved in a November 22, 2007 incident filed a use of force report.  The only detail provided in the sole report was:  "while inmate [DD] was being stripped he turned in an aggressive manner, myself and C. O. had to apply restraints, inmate continued to resist, after given numerous orders."

- On November 11, 2007, the ERT responded and used force to subdue DE, but only one member of the ERT filed a report in which the ERT's actions were described.  The force used, however, was inadequately described as follows:  "when the restraints were removed from [DE], he became combative with ERT.  ERT quickly subdued [DE] and applied restraints."

- Only one member of the ERT who responded to restrain DF filed a report in which the force used was described.  Again, the report was inadequate.  The December 12, 2007, incident was inadequately documented as follows:  "inmate became violent and ERT use necessary force to place the inmate in full restraints."

- On November 23, 2007, the ERT responded and used force against DG, but only one member of the ERT filed a report in which force was described.  The correction officer inadequately described the incident, and force used, as follows:  "ERT proceeded with the search and [DG] became assaultive and combative.  ERT regained custody of [DG] and he continued to deal with my orders with indifference.  [DG]'s head began to shake and he appeared to be in some sort of medical distress."

- Even though the ERT responded and used force against DH on October 13, 2007, only one member of the ERT filed a report, in which force was described as follows:  "There he was being removed from handcuffs, and became unruly.  ERT used necessary force to regain control and place the inmate in handcuffs and leg irons."

- 16 -

- On January 2, 2007, an ERT responded and used force against DI in order to have the inmate remove his clothing.  Only one member of the ERT filed a report.  The forcible disrobing of DI is inadequately summarized in the report as follows:  "I gave him an order to remove all of his clothing. [DI] did not comply with that order.  I then ordered ERT officers to remove the clothing, necessary force was used to obtain [sic] this task."

Finally, we were concerned with the video recording techniques used by WCJ staff.  In many of the videos we viewed, the usefulness of the tapes was limited because WCJ staff failed to focus the lens and properly position the filming officer to allow an adequate recording of the incident.  In some videos, it appeared that the filming officer permitted WCJ staff to physically obstruct the line of sight of the recording.[18]  Further, WCJ operates without a written policy on the retention of use of force videotapes.

###    4.    Detainee Grievances

WCJ fails to maintain an adequate detainee grievance system, further contributing to the problems of monitoring and investigation of use of force incidents.  An inmate grievance system is a fundamental element of a functional jail system, intended to provide a mechanism for allowing inmates to raise conditions of confinement related concerns and issues to the administration.  If viewed as credible by inmates, it can also serve as a source of intelligence to staff regarding potential security breaches as well as staff excessive force or other misconduct.  The grievance system should be readily accessible to all inmates.  Inmates should be able to file their grievances in a secure and confidential manner and without threat of reprisals.  Staff responsible for answering inmate grievances should do so in a responsive and prompt manner.  We found a number of serious concerns with the grievance process at WCJ.

Despite the pattern of force described above, the Facility Grievance Coordinator reported that no grievances have been filed by WCJ detainees for 2006 and 2007.  This clearly indicates that any grievance system is not functional, thus depriving WCJ of a valuable source of information concerning use of force incidents.

---

[18]    The late Judge Charles L. Brieant, Jr., who presided over the criminal proceedings against former WCJ Corrections Officer Paul Cote, observed  similar problems with the ERT videotapes, noting: "when the real action occurs, for some reason or another, the lens is either pointed at the floor or the ceiling."  Transcript of Proceedings, dated April 20, 2006, United States v. Cote, No. 06 Cr. 121 (CLB) at 17.

- 17 -

At least a partial explanation for the lack of grievances alleging excessive force is the requirement that a detainee is provided a grievance form "only after exhausting the informal complaint process." (See SOP V 02-07, Inmate Grievance Program). Requiring a detainee to pursue the matter informally compromises the review and investigative processes, especially in those instances in which unlawful actions may have occurred. Detainees who may have been subjected to unlawful force will at best be reluctant to seek resolution from those who may have witnessed or been involved in the very actions that would form the basis for the grievance.

### 5.   Employee Disciplinary Sanctions for Use of Force Violations

WCJ fails to adequately discipline officers for using excessive force against inmates. To ensure reasonably safe conditions for inmates, correctional facilities must develop and maintain adequate systems to investigate staff misconduct, including alleged physical abuse by staff. Generally accepted correctional practices require clear and comprehensive policies and practices governing the investigation of staff use of force and misconduct. Adequate policies and practices include, at a minimum, screening of all Use of Force and Incident Reports, specific criteria for initiating investigations based upon the report screening, specific criteria for initiating investigations based upon allegations from any source, timelines for the completion of internal investigations, and an organized structure and format for recording and maintaining information in the investigatory file. The investigation must also be and appear to be unbiased.

In our investigation, we found that WCJ fails to initiate disciplinary measures to correct officers who use excessive force. This may be due to lack of oversight and adequate reporting, or also because of deficiencies within WCJ policies. While WCJ officers are subject to a Code of Conduct (SOP II 20-02), the Code has not been revised since 1998. The Code does not contain provisions that prohibit physical abuse of inmates, and does not define excessive or unnecessary force. While the policy prohibits force to be used as punishment, the Code fails to provide proper guidance regarding employee sanctions when excessive force is used.

### 6.   Inmate Classification

Although WCJ utilizes a charge-based classification scheme, i.e., custody categories determined largely based on the detainee's criminal charge, a review of the December 27, 2007 Housing Roster indicates that detainees of as many as three different housing categories are routinely co-mingled. For instance, 2-NE in the

- 18 -

New Jail houses inmates of three separate custody categories (AA, A, & B).[19]
Various levels of co-mingling of detainees by custody categories can be seen
throughout the facility.

Generally accepted professional standards require that jails adequately
classify and segregate inmates based on legitimate penological needs. The primary
purpose of an inmate classification scheme is to provide separate housing for
detainees based on differing levels of needs and security risks. The routine and
indiscriminate mixing of custody categories is often associated with high levels of
inmate-on-inmate violence; such high levels most often occur within institutional
settings and crowded multiple occupancy housing (double/triple celling and
predominance of dorm housing). WCJ operates below capacity with single celling
and a 1:1.8 officer/inmate ratio. A review of all incident reports for 2007 and other
data on inmate safety indicates that WCJ does not have high levels of
inmate-on-inmate violence. However, these same incident reports do provide
examples of serious assaults between and among detainees of different custody
categories. While WCJ officials do routinely move to separate such offenders by
housing and "keep separate" designations, WCJ officials should seriously consider
implementing a more objective classification scheme that anticipates an increase in
population, when single celling the entire population is no longer possible. Any
abnormal rise in inmate-on-inmate violence involving predatory conduct by high
custody offenders against low custody offenders, regardless of the current favorable
conditions (a single celled population under capacity), will require a more objective
scheme that provides for housing separation based on security risks.

### 7.    Inmates in Protective Custody

WCJ provides separate housing for inmates requiring protective custody.
These inmates are confined in a virtual lockdown setting (in-cell for over 22 hours a
day). While these inmates may require separation from general population inmates,
access to programs and services for such a population is still required. Unless their
custody level dictates otherwise, such detainees should be permitted more than one
hour out-of-cell per day; the current management of these Protective Custody
detainees constitutes, for all practical purposes, punitive segregation housing.

---

[19]    WCJ uses five custody categories to classify its inmates. AAA is the highest
level security classification. AA and A follow. Generally, AA and A classifications
are assigned to inmates charged with crimes against persons. B is next highest.
Generally, B is assigned to inmates charged with crimes against property. C is the
lowest security level classification.

## B.    MEDICAL CARE DEFICIENCIES

Jail officials are responsible for providing adequate medical care to inmates. Moreover, a jail may not deny or intentionally interfere with medical treatment.  A delay in providing medical treatment may be so significant that it amounts to a denial of treatment.  Our investigation revealed that there are certain aspects of the medical care and treatment offered at WCJ to be commended, for example, the Jail's affiliation with the Westchester Medical Center,[20] use of Telemedicine and Digital Radiography,[21] and Methadone treatment program.  However, there are some areas where the medical care provided at WCJ falls below the constitutionally required standards of care.  Specifically, we found the following deficiencies: inadequate infection control; inadequate access to dental care; and an inadequate medical grievance process.[22]

### 1.    Infection Control

WCJ fails to adequately treat, contain, and manage infectious disease.  This failure is dangerous and places inmates, staff, and the community at unnecessary risk of serious health problems.  The WCJ's management of *Methicillin resistant Staphylococcus aureus* ("MRSA")[23] deviates from generally accepted correctional

---

[20]    As a result of this relationship, WCJ inmates have ready access to clinical specialists, providers, and nurses.  The relationship also provides additional clinical services and academic resources to the health services in the jail.

[21]    Telemedicine and Digital Radiography is a technology where medical information is transferred via telephone, the Internet or other networks for the purpose of consulting, and sometimes remote medical procedures or examinations. These technologies can improve the quality of care and access to specialty services beyond the scope of what the Jail may be able to provide.

[22]    While at the facility we observed a newly admitted inmate being interviewed in an open area within sight and sound of other inmates and correctional staff. While this appeared to be an isolated incident, all attempts should be made to safely conduct health examinations with sight and sound privacy.

[23]    MRSA is a potentially dangerous drug-resistant bacteria that can cause serious systemic illness, permanent disfigurement, and death.  A MRSA infection is sometimes confused by detainees and medical staff as a spider or insect bite, causing treatment to be delayed while the infection has time to worsen or spread.  See http://www.aafp.org/fpr/20041100/10.html.  (Last visited May 21, 2009.)  MRSA is resistant to common antibiotics, such as methicillin, oxacillin, penicillin, and amoxicillin.  MRSA is almost always spread by direct physical contact.  However,

- 20 -

medical standards.  Inmates with infectious diseases at WCJ are not appropriately contained, treated, or managed.  Indeed, MRSA infections typically occur more often in an environment of congregated living such as WCJ.  It is important for medical staff to be aware of MRSA infections because MRSA is contagious and can lead to serious medical complications, including death.  Improper treatment may prolong the condition and the period of contagion.

At the time of our on-site investigation, WCJ had reported no MRSA infections at its facility for several months.  Given the propensity for MRSA to flourish in an environment such as WCJ, the lack of recorded cases is unsettling.  Indeed, we identified several likely cases through inmate interviews and examination of inmate medical records.  For example:

- Inmate MA was initially evaluated on August 28, 2007 for a "spider bite" infection that continued to worsen. AB was also examined on August 30th, September 5th, September 11th, and September 17th. He was prescribed Keflex,[24] but the condition developed into a localized cellulitis.[25]  The chart does not indicate that MRSA was considered, and no cultures were performed.

- Inmate MB was initially evaluated on August 15, 2007 for a "spider bite" under his arm.  He was seen again on September 11th, at which time he was prescribed Keflex.  MB was subsequently seen on multiple occasions regarding the same "spider bite" on September 22nd, September 28th, October 23rd, and December 19th, without resolution. The chart does not indicate that MRSA was considered, and no cultures were performed.

---

spread may also occur through indirect contact by touching objects such as towels, sheets, wound dressings, and clothes.  MRSA can be difficult to treat and can progress to life-threatening blood or bone infections.  See MedicineNet.com, http://www.medicinenet.com/staph_infection/page2.htm.  (last visited May 21, 2009.)

[24]    Keflex is a cephalosporin antibiotic.  It is commonly used to "treat infections caused by bacteria, including upper respiratory infections, ear infections, skin infections, and urinary tract infections."  See http://www.drugs.com/keflex.html (last visited May 21, 2009.)

[25]    Cellulitis is a skin infection caused by bacteria that gets into the skin and spreads to deeper tissues.  See MedicineNet.com, http://www.medicinenet.com/cellulitis/article.htm.  (last visited May 21, 2009.)

- 21 -

- Inmate MC was evaluated for a "boil" under his arm on August 27, 2007, accompanied by a fever of 101 degrees Fahrenheit and cellulitis.  He was prescribed Dicloxacillin.[26]  The condition continued, and MC was seen again on September 2nd, 3rd, 4th, and 11th.  He required an incision and drainage by a general surgeon, and the condition was finally resolved on September 27, 2007.  MC developed another lesion on January 11, 2008, and was prescribed Keflex.  The chart does not indicate that MRSA was considered, and no cultures were performed.

- Inmate MD was initially evaluated for a possible "insect bite" on October 21, 2007, and prescribed Keflex.  By October 23rd, the condition had worsened to a localized cellulitis.  On November 15th, MD was also treated for facial lesions.  MD's medication was switched from Keflex to Dicloxacillin; however, on November 19th, he was given more Keflex.  The chart does not indicate that MRSA was considered, and no cultures were performed.

- Inmate ME was seen for a skin infection on November 20, 2007.  He was prescribed a combination of sulfamethoxazole and trimethoprim (antibiotics commonly used to treat bacterial infections),[27] and the infection resolved without additional intervention.  The rapid response of the infection to Bactrim, a non-penicillin antibiotic to which most MRSA is sensitive, suggests that this infection was MRSA.

The cases described above were likely MRSA infections, but a definitive diagnosis of MRSA cannot be made if cultures of a wound are not performed.  However, if the condition fails to adequately respond to penicillin-derivative antibiotics (e.g., Keflex or Dicloxicillin) and appears clinically to be a typical MRSA infection (e.g., a "spider bite" or cellulitis), MRSA can be suspected.  The above cases illustrate that the lack of reported MRSA cases at WCJ likely due to the failure of WCJ staff to adequately identify the condition, rather than an absence of the infection among the prison population.  WCJ's medical staff's failure to identify the commonly known signs associated with MRSA, and, at a minimum, to conduct a culture of the infection when topical treatments proved futile, demonstrates a

---

[26]    Dicloxacillin is a penicillin antibiotic.  It is commonly used to treat many infections caused by bacteria, including bronchitis, pneumonia, or staphylococcal infections.  See http://www.drugs.com/mtm/dicloxacillin.html  (last visited May 21, 2009.)

[27]    See http://www.medicinenet.com/sulfamethoxazole_with_trimethoprim - _oral/article.htm  (last visited Jun. 4, 2009.)

- 22 -

failure of the medical staff to provide adequate medical care.  There is little evidence in the health records of these inmates that WCJ medical staff considered MRSA as an etiology for these infections.  Without surveillance of MRSA by culture or clinical suspicion, the facility is unable to monitor the effectiveness of prevention and control measures.

In failing to adequately treat, contain, and manage MRSA, WCJ has placed its inmates and staff and the community at unnecessary risk of serious health problems.  Indeed, in May 2008, just four months after our on-site investigation, a MRSA outbreak was reported at WCJ, affecting two inmates and two correctional officers.[28]

## 2.   **Dental Care**

Dental care is an important component of overall inmate health care.  Poor oral health has been linked to numerous systemic diseases.  Generally accepted correctional standards require that prisons provide surface restorations, prophylaxis, and preventative care.  Contrary to these standards, dental care at WCJ is not timely and does not include immediate access for painful or urgent conditions.  Moreover, there is little documentation to indicate that WCJ inmates receive preventive care following one year in custody.

The wait time for inmates to receive dental services at WCJ is unacceptably long, especially for inmates complaining of pain.  In the majority of records reviewed by our consultant, inmates requesting dental care were not seen by a dentist for four to six weeks.  Among those complaining of pain, approximately one-half received a short course of pain medication while waiting for a dental appointment.  Moreover, in the instances when an inmate actually saw a dentist, dental treatment was deferred to outside care.  In several of the medical records reviewed, the term "follow-up outside" routinely appeared, despite chronic pain expressed by the inmate.  In one extreme case, the dentist documented the patient's complaint as "I am suffering from serious pain and discomfort in my mouth because of the brackets and braces," and responded by writing "follow-up outside."  This response is unacceptable.  In the case of this inmate, he was still in custody six months after seeing the dentist.  The inmate submitted a request to see the dentist, stating that he was experiencing "serious pain in [his] mouth."  At that time the dentist indicated in the inmate's chart that the patient would be scheduled for treatment, but four months later, this still had not occurred.

---

[28]   See Glenn Blain, Superbug Reported at Westchester Jail, The Journal News, May 24, 2008, at 13A.

- 23 -

### 3.  Medical Grievance Process

Although WCJ has instituted a policy for submitting grievances, it is not consistently implemented or effectively publicized.  According to the Grievance Mechanism, CHS-A-11, inmate complaints must be written on an inmate Grievance Form and submitted to WCJ staff.  During our on-site visit, however, many of the corrections officers in WCJ's housing units did not have Grievance Forms available for inmates if requested.  Further, when inmates and jail staff were asked where an inmate could get a form to file a grievance, both the inmates and jail staff provided inconsistent responses.

Because inmates have no alternative options for health care other than the services provided them at WCJ, it is important for inmates to have access to a medical grievance process.  If an inmate perceives that his or her serious health needs are being unmet, the grievance process provides a mechanism to investigate the legitimacy of that concern.  In order to be effective, however, a grievance policy must made clear to prison staff and inmates.  As noted above, WCJ staff and inmates are not aware of the procedures for filing a grievance, and inmates are unable to obtain grievance forms on their housing units.  Without consistent access to grievance forms for inmates, the medical grievance process cannot operate as required.

### C.  INADEQUATE MENTAL HEALTH CARE

WCJ fails to provide inmates with adequate mental health care that complies with constitutional standards.  While WCJ employs the services of a mental health director to oversee the mental health services provided at the facility and operates a certified forensic unit, deficiencies remain.  In particular, deficiencies were found in the areas of forced medication and the treatment provided juvenile inmates.

### 1.  Use of Force to Involuntarily Administer Medications

ERTs are routinely employed to restrain an inmate who refuses to voluntarily submit to medication prescribed by a WCJ physician.  As noted above, each ERT is comprised of several correctional officers protected in full riot gear and helmets.  See Section III.A.1, supra.  In at least 33 incidents in 2007, ERTs were employed to physically restrain the inmates while a nurse administered the medication involuntarily.  In several of these incidents, physical force was used, including the use of chemical agents.  According to our consultant, the use of force and the application of mechanical restrains to administer involuntary medication is inappropriate and can be interpreted as forcing medication by intimidation.  Our

- 24 -

consultant reviewed videos of eleven inmates who were extracted by ESU for involuntary administration of medication, some of whom were forcibly medicated on multiple occasions.  For example:

- Forced medication was ordered for inmate PA.  An ERT was summoned to PA's cell at the request of medical staff and asked PA to come forward to receive his injection.  PA refused while lying on his bed reading papers.  The ERT again ordered PA to come forward, informing him that they were authorized to use chemical agents if necessary.  Again, PA did not comply, and continued to lie down and read.  The ERT then rushed into PA's cell, restrained him while he was lying in his bed, and – even though PA had not been threatening, violent, or out of control – discharged pepper spray into his face.  After the ERT had left, PA began to feel the effects of the chemical agent.  The ERT then re-entered PA's cell and escorted him to a shower room for decontamination.  Following a shower, PA was moved into a medication room, where he was stripped naked and injected by the nurse while under continuous restraint.  The medical record contains no documentation of the circumstances preceding or following the incident, and no medical assessment was conducted following the application of force.

- Forced administration of medicine was ordered for inmate PB, who was reportedly acting erratically and aggressively toward staff.  Summoned to assist in  administering the medication, the ERT physically restrained PB on the ground, placing him in a "hog-tie" position.  The ERT then lifted PB and moved him into a treatment room.  Once in the room, PB was pushed against the wall, causing him to scrape his face.  As the ERT officers tried to hoist and position him, PB slid passively toward the floor and hit his knee, which began to bleed.  During the incident, PB cried out, "this hurts," and "I can't breathe," and moaned as he was tossed around by the team.  Eventually, PB was escorted to an area for nurses to tend to his bleeding.  The ERT officers reported that PB "gave himself some scrapes and scratches" and that he "scraped his knee when he assaulted the officer."  However, the video indicates otherwise.  PB appeared cooperative as the medical team provided care.  Naked, shackled, and handcuffed, PB was then escorted aggressively down the hall, once again shouting that he was in pain.  The manner in which PB was escorted appeared in the video to be very abrupt, rough, and painful.  The medical record contains no details of the events surrounding this use of force.

- 25 -

- Inmate PC was placed into the Forensic Unit following admission to WCJ and assessed as having psychosis with possible risk to harm himself or others. The ERT was called by medical staff to assist with PC's forced medication order on two different days, and the use of OC spray was authorized by the psychiatrist on both occasions. On the first day, PC was resting on his bed in no distress when the ERT approached his door and asked him to lie face down and put his hands behind his head. After PC complied, the team rushed into his room and roughly stretched his arms and legs into a hog-tied position. The nurse administered the injection and departed. The team slowly released PC, and although he shouted in some pain, they left the room. The medical record did not comment on this event. The next day, the team was again asked to assist with administering medication. PC, who was sitting calmly on his bed, laid down as requested by ERT and put his hands behind his head. When the team entered the room, PC began to move, and the team aggressively wrestled him to the floor, where he was put into the hog-tie position and pulled across the floor by his legs. As PC was being pulled across the floor, his shirt pulled up and his bare abdomen scraped across the floor. PC was then hoisted by his legs and arms behind his back on the bed, and his legs and arms were tightly compressed so he could not move. The nurse then entered the room to administer injections to his buttocks. Although PC occasionally screamed of pain, and at one point uttered, "I can't breathe," the nurse did not react, and did not evaluate or discuss the tight position of the restraints by the ERT. The medical record does not include an assessment before or after the use of force.

- Inmate PD was in the Forensic Unit refusing to answer questions or cooperate with medical examinations. Almost two weeks after being in WCJ, the medical team authorized the use of force by the ERT so that PD would have a chest X-ray in order to screen for tuberculosis. A single note, written after the X-ray was taken, explained that an attempt was made to persuade PD to have the chest X-ray, but that he calmly declined. No prior notes documented any attempt to screen the patient for tuberculosis. The ERT ordered PD to lie face down on the bed, and he complied. PD was put into full mechanical restraints, shuffled down the hallway to the X-ray room, and underwent an X-ray.

The use of force and application of mechanical restraints in the above incidents were excessive and disproportionate to the threats presented. If therapeutic intervention was the reason for ordering that these inmates be involuntarily medicated, the manner of delivery was the antithesis of therapy and caused harm. Even in incidents where the ERT does not use force to restrain the

inmate, the process can still be interpreted as forcing medication by intimidation. There are more appropriate and less violent methods to administer involuntary medication to patients who need intervention, such as providing intensive counseling to inmates concerning the need for such medication. There is little evidence in the medical records that WCJ staff attempted such counseling prior to calling in ERT.

Moreover, the number of incidents where ERT is employed to assist with involuntary medications is high. The actual use of force, including the use of chemical agents, is aggressive and not therapeutic. Based on the videotapes reviewed by our consultant, none of the inmates discussed above presented an immediate or serious risk to themselves or others. In the case of PA, for example, there was no display of aggressive or threatening behavior by the inmate to justify the deployment of pepper spray. Similarly, in the case of PB, there was no display of aggressive or threatening behavior to justify the rough treatment.

In addition, WCJ staff have failed to adequately document occasions in which medication is forcibly administered. In every instance in which force is used to administer medication to an inmate, the medical record should clearly indicate the medical justification for involuntary medication, as well as the circumstances necessitating the use of force. Jail staff should also include a thorough assessment and documentation of the inmate's condition following the forced medication in the inmate's medical record, including incidents where only intimidation is used, to ensure that any injuries sustained during the involuntary administration are properly treated. Moreover, a thorough assessment and documentation of the inmate's condition will alert staff as to whether the medication has the desired effect on the inmate or whether there are any adverse side effects. In the above cases, involuntary medication was ordered, but our consultant was unable to determine the basis of these orders from a review of the incident notes, medical records or the videotape. In addition, as also noted above, the medical record did not appropriately document the inmate's condition or the circumstances surrounding the use of force.

## 2.   **Confinement Rounds**

WCJ's Special Housing Unit ("SHU") is the disciplinary segregation unit for male inmates. Inmates housed in the SHU are isolated in individual cells with self-contained toileting and showering facilities. Because the cells are self-contained, the inmate is rarely brought out of his cell. Each inmate has access to a recreation area and is permitted one hour of recreation time, to be served alone. Our consultant found that while inmates housed in confinement areas received previously arranged or established mental health treatment, most inmates do not receive routine mental health evaluations.

- 27 -

Inmates confined in isolation or segregation have an increased risk of mental health deterioration. Generally accepted correctional practices suggest that regular psychological assessments by a qualified mental health professional are necessary to ensure the mental health of an inmate confined in such units beyond 30 days.[29] Many of the inmates are confined in the SHU for well over 30 days. Accordingly, qualified mental health professionals should make segregation rounds at least once a week to identify those inmates at risk of experiencing psychological deterioration. Although WCJ medical staff conducts and documents daily rounds in the SHU, this does not constitute an appropriate mental health assessment.

### D.   JUVENILES

WCJ houses both juveniles awaiting processing to determine transfer to a juvenile detention facility and juveniles adjudicated as adults. Under New York State law, minors as young as thirteen years old may be tried and convicted as adults.[30] Despite this legal categorization, minors who are adjudicated as adults are still developmentally, physically, and mentally adolescents. WCJ's treatment of juveniles raises serious constitutional concerns regarding the length of disciplinary sentences and the adequacy of the mental health care and suicide prevention for juveniles housed in the SHU. We are also concerned with the Jail's failure to adequately separate juveniles from adult inmates by sight and sound, in contradiction to generally accepted correctional standards, and the Jail's failure to seek parental consent for the administration of psychotropic medication.

#### 1.   Juveniles in the SHU

##### a.   Length of Disciplinary Sentences

Based on our consultant's review of the inmate logs at the SHU, since December 2007, half of the admissions to the SHU were inmates ranging in age between 16 and 18 years old. A review of the disciplinary records for the five of the six minors in SHU on December 31, 2007, reveal that the average sanction imposed was in excess of 365 days, with the longest period of isolation, at the time of our on-site investigation, recorded at 510 days. One 16-year-old minor was given a sanction of 360 days for refusing to lock-in from the dayroom and allegedly taking a swing at an officer. While we acknowledge the seriousness of the disciplinary infraction, a one-year term of isolation/seclusion for a minor is an extremely severe sanction, especially when contrasted with an adult detainee in the SHU who was

---

[29]   Standards for Adult Correctional Institutions, 4th Edition, 4-4255.

[30]   New York Penal L. § 1.20(42) (2008); New York Crim. Proc. L. § 720.10(1)-(2).

- 28 -

given a 45-day sanction for assaulting another inmate.  Just two months prior, this
same adult inmate had assaulted and injured another inmate with a weapon.
Another 16-year-old minor was given 510 days for assaulting a correctional officer.
When he completes his SHU term for this disciplinary sanction he will be one
month short of his 18th birthday.  We also note that an 18-year-old was given an
indefinite sentence in the SHU.

The severity of these sentences imposed on a juvenile population raises
numerous constitutional issues.  The length of these sentences create an "atypical
and significant hardship," requiring the application of due process in disciplinary
proceedings.  Sandin v. Conner, 515 U.S. 472, 484 (1995);  Colon v. Howard,
215 F.3d 227 (2d Cir. 2000) (finding 305 days "atypical").  While sentences of this
length may not pose disproportionality problems in an adult population,[31] our
consultants expressed serious concern about the imposition of such lengthy
sentences on a juvenile population.  Further, such sentences may inflict substantial
psychological harm on such a population, particularly where, as detailed below in
Section III.D.1.a, adequate controls are not in place to identify and remedy such
harm.

### b.    Mental Health and Suicide Prevention

At WCJ, the excessive SHU sentences given to juveniles have contributed to
the deteriorating mental health of those juveniles, as illustrated by the following
examples.  This is especially true given the lack of routine mental health care for
SHU inmates.  See Section III.C.2, supra.  Inmates housed in the SHU do not
receive routine mental health evaluations, unless previously arranged prior to
admittance in the SHU.  As a result, deterioration of mental health is either
unnoticed or ignored.  For example:

- Inmate SA is 16 years old.  He was placed in the SHU on July 5, 2007,
  only five days after he entered the facility.  SA received a sentence of
  510 days in isolated confinement as a result of an altercation that
  caused injury to a correctional officer, which again took place within
  the first few days of his incarceration.  After two months of being in

---

[31]    See, e.g., Dixon v. Goord, 224 F. Supp. 2d 739, 748 (S.D.N.Y.  2002) (inmate's
punishment of ten months in SHU after being found guilty of assaulting a prison
officer was "penologically justified and not grossly disproportionate") (citing
Sostre v. McGinnis, 442 F.2d 178, 190-94, & n.28 (2d Cir. 1971) (serious offenses
can justify lengthy disciplinary detention).

the SHU, SA attempted to cut his wrists, although this did not result in a major injury.  A mental health evaluation was performed and concluded that he had "poor impulse control."

- Inmate SB is 18 years old.  At the time of our visit, SB was serving 240 days in the SHU.  He was first admitted to the SHU for 30 days in 2007, and then readmitted on August 1, 2007, for 240 days.  When SB first entered WCJ he had a negative psychiatric screen except for a history of Attention Deficit Hyperactivity Disorder, and it was determined at that time that no additional mental health intervention was required.  However, twelve days after being admitted to the SHU for the second time, SB began to exhibit suicidal ideation.  On August 12th, SB made a suicidal gesture of hanging, followed by a razor blade threat to harm himself on August 26th.  SB's behavior was identified by mental health staff as "poor impulse control."  SB has continued to be a behavioral and management challenge for the officers in the SHU.

WCJ lacks a process of identifying and recognizing special mental health needs for its juvenile population.  There is little evidence to suggest that WCJ employs any special accommodation or therapeutic approach that recognizes the special needs of adolescents or juveniles regarding their behavior and development. For example:

- Inmate SB, described above, has not been frequently followed by mental health staff.  In November 2007, SB was placed on Risperdal,[32] an antipsychotic medication.  A few weeks later, the medication was discontinued due to his non-compliance.  A mental health treatment plan, drafted on November 27, 2007, indicated that a follow-up meeting was scheduled for February 27, 2008.  There were no interval evaluations or mental health interventions.  During this time, SB's behavior continued to deteriorate.

- Inmate SC is 18 years old.  He was observed in a suicide prevention cell in the booking area.  SC was brought into the suicide prevention cell from the general population juvenile housing area.  He indicated that he was having trouble coping in the area with the other juveniles, although he was not specific as to why he was having trouble coping, and had several superficial self-inflicted abrasions.  This was his third admission to the suicide prevention cell within a week.  Each time he

---

[32]    Risperdal is commonly used to "treat schizophrenia and symptoms of bipolar disorder."  See http://www.drugs.com/risperdal.html.  (last visited May 21, 2009).

- 30 -

was observed in the suicide cell, mental health staff determined that SC no longer posed a suicide risk, and he was subsequently returned to the general juvenile area.

As these examples illustrate, WCJ is not providing adequate mental health treatment and suicide prevention for juveniles in its facility.  The number of juveniles in the SHU, and the level of problems caused by those juveniles, are disproportionate to the number of juveniles housed at WCJ.

## 2.    <u>Sight and Sound Separation</u>

Generally accepted correctional standards require the sight and sound separation of juveniles from adults.  WCJ does not appropriately apply sight and sound separation when it comes to the separation of juveniles and adults.  On one floor at WCJ dedicated to female inmates, female juveniles were housed in the back corner of a housing unit for adult females.  Within this unit, the adult and juvenile females were separated by a metal mesh fence that did not prevent open visualization and communication.  In addition, male juveniles confined to the SHU were within sound, and often sight, of adult males in the SHU.  Separation of juvenile populations from adults is a requirement of correctional standards.  The potential for harassment and verbal victimization, if not more, is possible if adult prisoners are not separated by sight and sound.

## 3.    <u>Consent to Treatment</u>

Generally accepted correctional standards require that the consent of a parent, guardian, or legal custodian, be obtained in order to prescribe medications for chronic or mental health conditions for inmates under the age of 18.  Our consultant, however, found that WCJ did not consistently maintain a consent form signed by a parent or guardian for each juvenile inmate.  For example:

- Inmate VA is 16 years old.  She was placed on psychotropic medications.  No consent was found in her medical records.

- Inmate VB is also 16 years old.  She was placed on psychotropic medications.  While her medical records reflect a telephone discussion with a parent regarding her treatment, no formal consent form could be found.

- Inmate VC is also 16 years old.  She was placed on psychotropic medications.  However, unlike inmates VA and VB, inmate VC had an informed consent form signed by a parent consenting to treatment.

Persons under the age of 18 years require consent of a parent or guardian prior to the delivery of most health care services.  This consent is not consistently being obtained at WCJ.

## IV.  <u>REMEDIAL MEASURES</u>

In order to address the constitutional deficiencies identified above and protect the constitutional rights of detainees, the Jail should implement, at a minimum, the following measures in accordance with generally accepted professional standards of correctional practice:

**A.    Protection from Harm**

    1.    Use of Force

        a.    Develop and maintain comprehensive policies and procedures, consistent with current legal standards, regarding permissible use of force.  Such policies and procedures should specifically include, <u>inter</u> <u>alia</u>, the following:

            (i)   Definitions of force and excessive or unnecessary force.

            (ii)  Prohibition on the use of force as a response to verbal insults or inmate threats.

            (iii) Prohibition on the use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless WCJ has attempted a hierarchy of nonphysical alternatives which are documented.

            (iv)  Prohibition on the use of force as punishment.

            (v)   Prohibition on the use of crowd control chemical agents on individual inmates and develop and maintain a policy and practice for the appropriate use of chemical agents.

- 32 -

b.   Establish effective oversight of the use of force.

(i)   Develop and implement a policy to ensure that staff adequately and promptly report all uses of force. Such policies and procedures should include, <u>inter alia</u>, provisions for the following:

(A)   Development and implementation of a standardized use of force reporting form.

(B)   Ensuring that all staff receive training in how to complete a use of force reporting form and to properly describe a use of force incident on such a form.

(C)   Ensuring that all staff involved in or witnessing any use of force incident adequately and promptly report such use of force.

(ii)   Develop and implement a policy and practice for management review of all use of force incidents.

(iii)   Ensure that review of incident reports, use of force reports, videotapes recording use of force incidents, and inmate grievances involving or alleging use of force by ERT is performed by management without direct supervisory authority over ERT members or supervisors.

(iv)   Ensure that incident reports, use of force reports, videotapes recording use of force incidents, and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria for misconduct, that it is referred for investigation.

(v)   Ensure that management review of incident reports, use of force reports, videotapes recording use of force incidents, and inmate grievances alleging excessive or inappropriate uses of force

- 33 -

includes a timely review of medical records of inmate injuries as reported by medical professionals.

(vi)  Develop and implement comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct.

(vii) Develop and implement policies, procedures, and practices on the proper use of videotapes for recording of use of force incidents and storage and retention of such videotapes.

(viii)Develop and implement policies, procedures and practices for the effective and accurate maintenance, inventory and assignment of chemical and other security equipment.

(ix)  Develop and implement a process to track all incidents of use of force that at a minimum includes the following information:  the inmate(s) name, housing assignment, date and type of incident, injuries (if applicable), if medical care is provided, primary and secondary staff directly involved, reviewing supervisor, external reviews and results (if applicable), remedy taken (if appropriate), and administrative sign-off.

c.  Develop an effective and comprehensive training program in the appropriate use of force.

(i)  Ensure that staff receive adequate competency-based training in WCJ's use of force policies and  procedures.

(ii)  Ensure that staff receive adequate competency-based training in use of force and defensive tactics.

(iii) Ensure that management and staff involved in use of force investigations receive adequate competency-based training in conducting investigations of use of force allegations.

- 34 -

2.    Safety and Supervision

  a. Ensure that correctional officer staffing and supervision levels are appropriate to adequately supervise inmates.

  b. Ensure that inmate work areas are adequately supervised whenever inmates are present.

  c. Ensure frequent and documented security rounds timed at varying intervals by correctional officers inside each housing unit.

  d. Develop and implement policies and procedures requiring all tools, utensils, equipment, flammable materials, etc. to be inventoried and locked down when not being used.

  e. Ensure that staff adequately and promptly report safety- or security-related incidents.

  f. Develop a process to track all serious incidents that captures all relevant information, including:  location, any injuries, if medical care is provided, primary and secondary staff involved, reviewing supervisor, external reviews and results (if applicable), remedy taken (if appropriate), and administrative sign-off.

  g. Ensure that inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures.

  h. Increase use of overhead recording security cameras throughout the common areas of the facility and ensure that the use of cameras are to supplement and not replace supervision.

  i. Review, and revise as applicable, all security policies and SOPs on an annual basis.

  j. Review, and revise as applicable, all security post orders regularly.

- 35 -

k.     Revise policies, SOPs, and post orders for all staffed posts to include instruction on use of deadly force and when and under what circumstances weapons should be used.

l.     To the extent possible, taking into account the different security levels and different physical layouts in the various divisions, standardize security policies, procedures, staffing reports, and post analysis reports across the divisions.

m.     Provide formal training on division-specific post orders each time a correctional officer is transferred from one division to another.

n.     Implement specialized training for officers assigned to special management units, which include the SHU, disciplinary segregation, and protective custody units. Officers assigned to these units should possess a higher level of experience and be regularly assigned to these units for stability purposes.

3.     Disciplinary Process

a.     Ensure that inmates are afforded due process for any disciplinary actions against them, including promptly receiving a disciplinary ticket, a written decision detailing the reasons for the decision and length of sentence, and a fair hearing.

b.     Ensure that disciplinary hearings are conducted in a private setting.

c.     Develop and implement a policy, procedure and practice to review sentences committing inmates to the SHU for longer than 30 days.

d.     Develop and implement a policy, procedure and practice to ensure that juvenile offenders are not incarcerated in the SHU in a manner or at such length inconsistent with their age and developmental needs.

- 36 -

4.      Classification

      a.      Develop and implement policies, procedures and practices for an objective classification system that separates inmates in housing units by classification levels.

      b.      Update facility communication practices to provide officers involved in the classification process with current information as to cell availability on each division.

5.      Inmate Grievance Procedure

      a.      Develop and implement policies, procedures, and practices to ensure inmates have access to an adequate grievance process that ensures that grievances are processed and legitimate grievances addressed and remedied in a timely manner, responses are documented and communicated to inmates, inmates need not confront staff prior to filing grievances about them, and inmates may file grievances confidentially.

      b.      Ensure that grievance forms are available on all units and are available to inmates with Limited English Proficiency.

      c.      Ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, referred for investigation.

6.      Access to Information

      a.      Ensure that newly admitted inmates receive information they need to comply with facility rules and regulations, be protected from harm, report misconduct, access medical and mental health care, and seek redress of grievances.

      b.      Ensure that inmates who are not literate are afforded the opportunity to have information on facility rules and services explained to them orally.

      c.     Ensure that information on facility rules and services is available in Spanish.

   7.    Employee Discipline

      a.     Ensure Employee Code of Conduct includes prohibition on use of excessive or unnecessary force.

      b.     Update Standard Operating Procedure on Use of Force to include definition of excessive or unnecessary force and appropriate sanctions for use of such force.

## B. Medical Care

   1.    Intake Screening

      a.     Ensure that adequate intake screening and health assessments are provided.

      b.     Develop and implement an appropriate medical intake screening instrument that identifies observable and non-observable medical needs, including infectious diseases, and ensure timely access to a physician when presenting symptoms require such care.

   2.    Treatment and Management of Communicable Disease

      a.     Provide adequate treatment and management of communicable diseases, including MRSA.

      b.     Ensure that inmates with communicable diseases are appropriately screened, isolated, and treated.

      c.     Develop and implement an adequate MRSA control plan in accordance with generally accepted correctional standards of care.  Such plan should provide guidelines for identification, treatment, and containment to prevent transmission of MRSA to staff or inmates.

      d.     Develop and implement policies that adequately manage contagious skin infections.  Develop a skin infection control plan to set expectations and provide a work plan for the prevention of transmission of skin infections,

- 38 -

including drug-resistant infections to staff and other inmates.

    e.    Develop and implement adequate guidelines to ensure that inmates receive appropriate wound care.

3.    Dental Care

    a.    Ensure that inmates receive adequate dental care in accordance with generally accepted professional standards of care.  Such care should be provided in a timely manner.

    b.    Ensure that inmates complaining of pain are provided with interim pain relief until they can be seen for dental appointments.

4.    Access to Health Care

    a.    Ensure inmates have adequate access to health care.

    b.    Ensure that the medical request process for inmates is adequate and provides inmates with adequate access to medical care.  This process should include logging, tracking, and timely responses by medical staff.

5.    Medication Administration

    a.    Ensure that treatment and administration of medication to inmates is implemented in accordance with generally accepted professional standards of care.

**C.    Mental Health Care**

1.    Timely and Appropriately Evaluate Inmates

    a.    Ensure WCJ properly identifies inmates with mental illness through adequate screening.

2.    Assessment and Treatment

    a.    Ensure that treatment plans adequately address inmates' serious mental health needs and that the plans

- 39 -

contain interventions specifically tailored to the inmates' diagnoses and problems.

b.     Ensure that mental health evaluations done as part of the disciplinary process include recommendations based on the inmate's mental health status.

3.    Psychotherapeutic Medication Administration

a.     Ensure that ERTs are not used to administer involuntary medication unless the inmate is clearly uncontrolled and presenting an immediate risk to him/herself or others.

b.     Ensure that, after each use of force employed in connection with involuntary administration of medicine, the medical record clearly documents the reasons for administering medication involuntarily, the use of force employed to administer medication, and the inmate's condition following the use of force.

4.    Other Mental Health Issues

a.     Ensure that a psychiatrist or physician conducts an in-person evaluation of an inmate prior to a seclusion or restraint order, or as soon thereafter as possible. Seclusion or restraint orders should include sufficient criteria for release.

b.     Ensure that all staff (including correctional officers) who directly interact with inmates receive competency-based training on basic mental health information (e.g., diagnosis, specific problematic behaviors, psychiatric medication, additional areas of concern); recognition of signs and symptoms evidencing a response to trauma; and the appropriate use of force for inmates who suffer from mental illness.

c.     Ensure that all inmates housed in isolated confinement areas, such as the SHU, receive weekly mental health screenings conducted by qualified mental health professionals.

- 40 -

    d.      Ensure that administrative segregation and observation status are not used to punish inmates for symptoms of mental illness and behaviors that are, because of mental illness, beyond their control.

**D.    Juveniles**

    1.    Isolation Confinement

        a.      Develop alternative disciplinary actions for juveniles violating institutional rules that result in appropriate time in isolation confinement.

        b.      Ensure that health care staff are involved in developing and implementing treatment plans for juveniles facing isolation confinement.

        c.      Ensure that juveniles held in the SHU have access to programs appropriate for juveniles.

    2.    Mental Health Care

        a.      Provide greater interaction with Jail Staff and more rehabilitative programming for juveniles, including those who have committed disciplinary infractions.

        b.      Ensure that juvenile inmates undergo mental health evaluations that address the special developmental needs of adolescents.

        c.      Ensure that juvenile inmates undergo mental health evaluations at regular intervals even if they are not receiving psychotropic medications.

    3.    Other Issues

        a.      Ensure that all juvenile inmates are provided housing that maintains sight and sound separation from adult inmates.

        b.      Establish a process for routinely obtaining signed consent forms from the parent or guardian of any juvenile receiving prescribed medications or health care

- 41 -

treatments unless otherwise permitted by state or local laws.

* * *

Please note that this findings letter is a public document.  It will be posted on the Civil Rights Division's website.  While we will provide a copy of this letter to any individual or entity upon request, as a matter of courtesy, we will not post this letter on the Civil Rights Division's website until ten calendar days from the date of this letter.

We hope to continue working with the County in an amicable and cooperative fashion to resolve our outstanding concerns regarding WCJ, and to develop specific policies and procedures that will implement the remedial measures discussed above. Assuming the County continues to cooperate, we also would be willing to send our consultants' evaluations under separate cover.  These reports are not public documents.  Although the consultants' evaluations and work do not necessarily reflect the official conclusions of the Department of Justice, their observations, analysis, and recommendations provide further elaboration on the issues discussed in this letter and offer practical technical assistance in addressing them.

We are obligated to advise you that, in the event that we are unable to reach a resolution regarding our concerns, the Attorney General may initiate a lawsuit pursuant to CRIPA to correct deficiencies of the kind identified in this letter 49 days after appropriate officials have been notified of them.  See 42 U.S.C. § 1997b(a)(1).

We would prefer, however, to resolve this matter by working cooperatively with you and are confident that we will be able to do so in this case.  The lawyers assigned to this investigation will be contacting you to discuss this matter in further detail.  If you have any questions regarding this letter, please call Shanetta Y. Cutlar, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-0195, or David Kennedy, of the United States Attorney's Office, at (212) 637-2733.

Sincerely,

Thomas E. Perez
Assistant Attorney General

- 42 -

PREET BHARARA
UNITED STATES ATTORNEY
FOR THE SOUTHERN DISTRICT
OF NEW YORK


_____          By:_____
Shanetta Y. Cutlar                David J. Kennedy
Chief                             Chief
Special Litigation Section        Civil Rights Unit



_____          _____
Tammie M. Gregg                   Rebecca C. Martin
Principal Deputy Chief            Kristin L. Vassallo
                                  Assistant United States Attorneys
Sheridan England
Zazy I. López
Trial Attorneys

cc:    Joseph K. Spano
       Commissioner of Correction
       County of Westchester

cc:    Charlene M. Indelicato
       County Attorney
       Office of the County Attorney